**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

AMERICAN MEDICAL SECURITY,
INCORPORATED; CLIENT FIRST
BROKERAGE SERVICES, INCORPORATED;
MARAN, INCORPORATED; TRIO METAL
PRODUCTS COMPANY, INCORPORATED;
UNITED WISCONSIN LIFE INSURANCE
COMPANY,
Plaintiffs-Appellees,

v.

DWIGHT K. BARTLETT, III, in his
capacity as Insurance Commissioner
of the State of Maryland,
Defendant-Appellant.

No. 96-1376

NATIONAL ASSOCIATION OF INSURANCE
COMMISSIONERS; NATIONAL EMPLOYEE
BENEFITS INSTITUTE; SELF-INSURANCE
INSTITUTE OF AMERICA, INCORPORATED,
Amici Curiae.

AMERICAN MEDICAL SECURITY,
INCORPORATED; CLIENT FIRST
BROKERAGE SERVICES, INCORPORATED;
MARAN, INCORPORATED; TRIO METAL
PRODUCTS COMPANY, INCORPORATED;
UNITED WISCONSIN LIFE INSURANCE
COMPANY,
Plaintiffs-Appellants,

v.

No. 96-1446

DWIGHT K. BARTLETT, III, in his
capacity as Insurance Commissioner
of the State of Maryland,
Defendant-Appellee.

NATIONAL ASSOCIATION OF INSURANCE
COMMISSIONERS; NATIONAL EMPLOYEE
BENEFITS INSTITUTE; SELF-INSURANCE
INSTITUTE OF AMERICA, INCORPORATED,
Amici Curiae.

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Alexander Harvey II, Senior District Judge.
(CA-95-1463-H)

Argued: October 28, 1996

Decided: April 11, 1997

Before NIEMEYER and MOTZ, Circuit Judges, and
DOUMAR, Senior United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Motz and Senior Judge Doumar joined.

**COUNSEL**

**ARGUED:** Dennis William Carroll, Jr., Assistant Attorney General, MARYLAND INSURANCE ADMINISTRATION, Baltimore, Maryland, for Appellant. Edward J. Birrane, Jr., EDWARD J. BIRRANE, JR., CHARTERED, Towson, Maryland, for Appellees. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General, Christina Gerstung Beusch, Assistant Attorney General, MARYLAND INSURANCE ADMINIS-TRATION, Baltimore, Maryland, for Appellant. Andrew Jay Graham, Kathleen A. Birrane, KRAMON & GRAHAM, P.A., Baltimore, Maryland, for Appellees. Gregory B. Stites, NATIONAL ASSOCIA-TION OF INSURANCE COMMISSIONERS, Kansas City, Missouri, for Amicus Curiae Association. Joseph Semo, REINHART, BOERNER, VAN DEUREN, NORRIS & RIESELBACH, P.C., Washington, D.C., for Amicus Curiae Employee Benefits Institute. John H. Eggersten, Michael J. Friedman, HONIGMAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, for Amicus Curiae Self-Insurance Institute.

_____


**OPINION**

NIEMEYER, Circuit Judge:

We must decide whether the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., preempts a Maryland insurance regulation that fixes the minimum attachment point for stop-loss insurance policies issued to self-funded employee benefit plans covered by ERISA. See Code of Maryland Regulations (hereafter "COMAR"), § 9.31.02 (Health Insurance -- Stop-Loss Coverage). The state regulation is designed to prevent insurers and self-funded employee benefit plans from depriving plan participants and beneficiaries of state mandated health benefits. See 22 Md. Reg. 913 (1995).

The district court entered summary judgment declaring that ERISA preempts the state regulation and that the regulation is, therefore, "void to the extent that it mandates or affects attachment points for stop-loss insurance policies purchased by self-funded or self-insured

3

employee benefit plans covered by ERISA." The Court also enjoined Maryland from enforcing the regulation or taking any other step "to regulate or affect the attachment points for stop-loss insurance policies purchased by self-funded or self-insured employee benefit plans."

Because the purpose and effect of Maryland's regulation is to force state-mandated health benefits on self-funded ERISA plans when they purchase certain types of stop-loss insurance, we hold that § 514(a) of ERISA, 29 U.S.C. § 1144(a), preempts the regulation, and, therefore, we affirm.

I

Client First Brokerage Services, Incorporated; Maran, Incorporated; and Trio Metal Products Company, Incorporated, are Maryland employers sponsoring self-funded employee health benefit plans subject to ERISA. Each has purchased stop-loss insurance from United Wisconsin Life Insurance Company ("United Wisconsin Life") and has engaged American Medical Security, Incorporated, ("AMS") as administrator of their plans. These Maryland employers purchased stop-loss insurance to cover their plans' benefit payments above an annual $25,000-per-employee level, known as the"attachment point." United Wisconsin Life was also agreeable to a lower attachment point, insuring a greater portion of the plans' payments, if requested to do so by the plans' sponsors. The stop-loss insurance afforded by United Wisconsin Life protected the plans themselves and not their participants or beneficiaries.

The employee benefit plans sponsored by these three Maryland employers contained substantially fewer benefits than the 28 mandated by Maryland for health insurance policies regulated by the Maryland Insurance Commissioner. See COMAR,§ 09.31.05.03. The benefit plans sponsored by these Maryland employers did not, for example, include benefits for skilled nursing facility services, outpatient rehabilitative services, and certain organ transplants, all of which are mandated for inclusion in Maryland health insurance policies.

In the course of its review of United Wisconsin Life stop-loss policies in the fall of 1994 -- insurance companies issuing policies to

4

Maryland residents are required to obtain prior approval for their policies, see Md. Code, art. 48A, §§ 242 & 375 -- the Maryland Insurance Agency disapproved United Wisconsin Life's stop-loss policies issued to the Maryland employers in this case because the attachment point was set informally at $25,000 and could be reduced at the employer's request. Since the policy could have an attachment point below $25,000 (the then mandated minimum), it was considered a policy of health insurance and, as such, was required to include mandated health benefits. See COMAR, §§ 9.31.02 & 9.31.05. Subsequently, the Maryland Insurance Commissioner dropped the minimum attachment point for stop-loss insurance to $10,000 of benefits paid to any single beneficiary annually. The Commissioner also imposed a minimum aggregate attachment point of 115% of total benefit payments expected to be paid to all plan beneficiaries. COMAR, § 9.31.03B.

The Maryland employers, United Wisconsin Life, and AMS filed suit seeking a declaratory judgment that the regulations are not enforceable and an injunction against their enforcement. They alleged that Maryland's insurance regulations -- which (1) establish a minimum attachment point for stop-loss insurance, and (2) deem stop-loss insurance policies with lower attachment points to be health insurance policies -- improperly sought to regulate employee benefit plans in violation of ERISA's preemption provision. On cross motions for summary judgment, the district court agreed with the plaintiffs and declared that ERISA preempts Maryland's regulations. This appeal followed.

II

This case presents the tension between Maryland's effort to guarantee through its regulation of insurance that employee benefit plans offer at least 28 state-mandated health benefits, see COMAR, § 09.31.05, and Congress' preemption, through ERISA, of any state regulation that "relates to" an employee benefit plan, see 29 U.S.C. § 1144(a).

ERISA is a comprehensive federal statute regulating private employee benefit plans, including plans maintained for the purpose of providing medical or other health benefits for employees. To assure

5

national uniformity of federal law, ERISA broadly preempts state law and assures that federal regulation will be exclusive. Section 514(a) provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" as defined by ERISA. The courts have interpreted this clause broadly to carry out Congress' purpose of displacing any state effort to regulate ERISA plans. See, e.g., FMC Corp. v. Holliday, 498 U.S. 52, 58 (1990) ("The pre-emption clause is conspicuous for its breadth"); Shaw v. Delta Airlines, Inc., 463 U.S. 85, 98 (1983) ("The section's pre-emptive scope [is] as broad as its language"). Thus, any law that "relates to" a plan is preempted by § 514(a), and the phrase "relates to" is given its common sense meaning, as having"[1] connection with or [2] reference to such a plan." Shaw, 463 U.S. at 96-97; see also District of Columbia v. Greater Washington Bd. of Trade, 506 U.S. 125, 129 (1992).

Although ERISA's preemptive scope is broad, the"savings clause" explicitly saves from ERISA's preemption those state laws that regulate insurance. See 29 U.S.C. § 1144(b)(2)(A). At the same time, however, the "deemer clause" provides that state insurance laws are not saved from preemption if they deem an employee benefit plan to be an insurance company in order to regulate it. See 29 U.S.C. § 1144(b)(2)(B); see also Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45 (1987). Thus, a preempted law is saved from preemption if it regulates insurance and does not deem ERISA plans to be insurers for purposes of the state regulation of insurance. But at bottom, state insurance regulation may not directly or indirectly regulate self-funded ERISA plans. See FMC, 498 U.S. at 62. Accordingly, although plans that provide benefits in the form of insurance may be indirectly regulated through regulation of that insurance, see id. at 62-64, plans that are self-funded or self-insured may not themselves be regulated as insurance companies even if the self-funded or self-insured plan purchases stop-loss insurance to cover losses or benefits payments beyond a specified level. See Tri-State Machine, Inc. v. Nationwide Life Ins. Co., 33 F.3d 309, 315 (4th Cir. 1994); Thompson v. Talquin Bldg. Prods. Co., 928 F.2d 649, 653 (4th Cir. 1991).

Stop-loss insurance provides coverage to self-funded plans above a certain level of risk absorbed by the plan. It provides protection to the plan, not to the plan's participants or beneficiaries, against bene-

6

fits payments over the specified level, called the "attachment point." Attachment points may be "specific" or "aggregate." Specific attachment points define the level of benefits paid to individual beneficiaries beyond which the insurance company will indemnify the plan. Aggregate attachment points define the total amount of benefits paid to all participants or beneficiaries beyond which the insurance company will indemnify the plan. Stop-loss insurance is thus akin to "reinsurance" in that it provides reimbursement to a plan after the plan makes benefit payments. See COMAR, § 09.31.02.02(5); Travelers Ins. Co. v. Cuomo, 14 F.3d 708, 723 (2d Cir.), rev'd on other grounds, 115 S. Ct. 1671 (1994); Thompson , 928 F.2d at 653.

The State of Maryland regulates health insurance, requiring that health insurance policies afford at least 28 specified benefits. See COMAR, § 09.35.05. Apparently not wishing to be subject to state-mandated health benefits, insurance companies and their ERISA plan clients have entered into arrangements under which plans self-fund benefits and purchase stop-loss insurance to insure themselves against benefits paid beyond designated attachment points. A stop-loss policy does not itself provide coverage for benefits. Since such a policy insures only those benefits defined and actually paid by the plan, the ERISA plan's sponsor, not state health insurance regulations, dictates the range of benefits provided. Thus, by absorbing a minimal amount of initial risk and insuring the remainder through stop-loss insurance, plans are able to provide health benefits of a kind or at a level different from what state law requires of health insurance.

Recognizing that such arrangements bypass Maryland's regulations for health insurance and intending to prevent such arrangements, the Maryland Insurance Commissioner adopted regulations that require plans to absorb the risk of at least the first $10,000 of benefits paid to each beneficiary. As the regulations' statement of purpose notes, the Commissioner seeks to protect Maryland residents "against acts by persons and insurers which deprive them of mandated health benefits." 22 Md. Reg. 913 (1995). Justifying the regulation and explaining how low attachment points permit self-funded ERISA plans to bypass state mandates, the Insurance Commissioner stated in his order:

> At very low attachment points, however, a "stop loss" policy is merely a substitution for health insurance. It does not

7

insure only against catastrophic loss. The self-funded health benefit plan is not regulated by the Insurance Commissioner and is not required to provide any of the state-mandated benefits. The goal is obvious: As policies become available with attachment points lower than many deductibles, it became an increasingly attractive option to "self-insure" a health plan, but to continue to shift the majority of the risk to the insurance carrier by purchasing "stop loss" coverage.

In re: Maryland Stop Loss Insurance Litigation , No. MIA-370-12195 at 4 (Dec. 8, 1995). The regulations accordingly provide that any stop-loss insurance policy with a specific attachment point below $10,000 is deemed to be a health insurance policy for purposes of Maryland's health insurance regulations and must therefore contain mandated benefits. See COMAR, § 09.31.02.03. On the other hand, if the specific attachment point is above $10,000 and the policy provides for payment only to the plan, and not to its participants and beneficiaries, it is considered to be traditional stop-loss insurance that essentially reinsures the risks defined by the plan. See id.

In summary, on one side of the issue before us, the Maryland Insurance Commissioner seeks to take advantage of his right under ERISA's savings clause to regulate the business of insurance. And on the other side, the insurance companies seek to take advantage of ERISA's preemption and deemer clauses to remove self-funded plans from the reach of state insurance regulation.

III

We begin the analysis with the question of whether Maryland's regulations "relate to" ERISA employee benefit plans and thus whether they fall within ERISA's preemptive scope. See 29 U.S.C. § 1144(a). A regulation relates to an employee benefit plan when it has a "connection with or reference to such a plan." Shaw, 463 U.S. at 96-97. The Maryland Insurance Commissioner wisely concedes that the regulations at issue do "relate to" ERISA plans. By their own terms, the stop-loss insurance regulations apply to "an employer's health plan," i.e., an ERISA health plan. See COMAR, § 09.31.02.02(4). "[W]here the existence of ERISA plans is essential to the [state] law's operation, . . . that `reference' will result in pre-

8

emption." <u>California Div'n of Labor Standards Enforcement v. Dillingham Constr., N.A.</u>, 117 S. Ct. 832, 838 (1997) (noting that state law that "has a connection with" or "reference to" an employee benefit plan is preempted). By virtue of the regulations' "reference to" ERISA plans, they "relate to" ERISA plans and fall within the scope of ERISA's preemption provision, 29 U.S.C. § 1144(a). <u>See Greater Washington Bd. of Trade</u>, 506 U.S. at 129.

Even though Maryland's regulations relate to ERISA plans, they nevertheless may be saved from preemption if they constitute a law that "regulates insurance," <u>see</u> 29 U.S.C. § 1144(b)(2)(A), without deeming an ERISA plan to be an insurance company or other insurer, <u>see</u> 29 U.S.C. § 1144(b)(2)(B). In determining whether a state law is one that "regulates insurance," it is not enough that it operate only on insurance companies or insurance policies. The regulation must regulate the business of insurance in the sense that the object of its regulation (1) "has the effect of transferring or spreading a policyholder's risk"; (2) "is an integral part of the policy relationship between the insurer and the insured"; and (3) "is limited to entities within the insurance industry." <u>Metropolitan Life Insurance Company v. Massachusetts</u>, 471 U.S. 724, 743 (1985).

In this case, the Maryland Insurance Commissioner can well argue with respect to the first <u>Metropolitan Life</u> factor that the setting of attachment points allocates risk. Higher attachment points burden plans with more risk while lower attachment points increase insurance company risk. The Commissioner might also be able to argue successfully on the second <u>Metropolitan Life</u> factor that the regulations address a practice integral to the insured-insurer relationship, at least if our analysis is limited to the explicit terms of the regulations. The regulations, by their own terms, seek to impose requirements only on insurance companies and their stop-loss insurance policies. This factor is, however, complicated by the fact that the intended, stated, and actual effect of the regulations is to reach the relationship between ERISA plans and their participants who are not parties to the insurance contract. The third <u>Metropolitan Life</u> factor is complicated in the same way. Although the state's regulation of attachment points is limited to entities in the insurance industry, the stated purpose of the regulations is also to reach the plan-participant relationship, a relationship which is outside the insurance industry.

9

While the Maryland Insurance Commissioner can thus make a superficial case that the regulations address the business of insurance, the complications of the second and third Metropolitan Life factors together with the "deemer clause" provide the core difficulty with the state's regulation of stop-loss insurance policies issued to ERISA plans.

We recognize that the regulations are carefully drafted to focus directly on insurance companies issuing stop-loss insurance and not on the employee benefit plans themselves. Thus, the regulations purport to define stop-loss insurance as health insurance subject to state regulation if the stop-loss insurance meets specific criteria. Notwithstanding the regulations' wording, however, their purpose and effect are directed at self-funded employee benefit plans that attempt to provide fewer health benefits to Maryland residents than state law mandates for health insurance policies. The state asserts a need for this regulation because, in its absence, the loophole would allow every self-funded plan to provide coverage for fewer health benefits than state law mandates for health insurance policies. It argues that absorbing a minimal risk is simply a sham to circumvent state insurance regulation, the area carved out by ERISA in which states may act. But in seeking to address this perceived loophole, the state in fact ends up regulating self-funded employee benefit plans that are exclusively subject to ERISA.

In seeking to require self-funded plans to offer coverage consistent with state insurance law, Maryland crosses the line of preemption. Even though the regulatory language targets stop-loss insurance policies, the Commissioner's stated purpose is to protect Maryland residents from self-funded ERISA plans and insurers"which deprive them of mandated health benefits." 22 Md. Reg. 913 (1995). The regulations thus use stop-loss insurance policies as a vehicle to impose the requirements of Maryland health insurance law on self-funded ERISA plans. By aiming at the plan-participant relationship, Maryland law violates the ERISA provision that no ERISA plan "shall be deemed to be an insurance company . . . for purposes of any law of any State purporting to regulate insurance companies[or] insurance contracts." 29 U.S.C. § 1144(b)(2)(B).

The state's fear that plans will circumvent state regulation and offer citizens too few health benefits is understandable. But to state that

10

fear reveals that Maryland is really concerned, not with the business of insurance and its coverage of risks, but with the benefits that ERISA plans can choose to provide their participants and beneficiaries. No matter how understandable this concern may be, only Congress may address it, not the State of Maryland through its insurance regulations. In attempting to address this concern through the regulation of stop-loss insurance, the state blurs the real distinction between self-funded plans, with or without stop-loss insurance, and fully insured plans.

Maryland's regulations distinguish self-funded plans from insured plans solely based on the level of the attachment point of stop-loss insurance. Thus, when the attachment point becomes low, Maryland deems self-funded plans with stop-loss insurance to be insured plans. See COMAR, § 09.35.02.02. This distinction overlooks the real risks.

Under a self-funded plan, the employer who promises the benefit incurs the liability defined by the plan's terms. That liability remains the employer's even if it has purchased stop-loss insurance and even if the stop-loss insurer becomes insolvent. Conversely, if the employer becomes insolvent, the solvency of the stop-loss insurer may not benefit plan participants and beneficiaries. This is because their claims against the insurer would be derivative of the plan's claim against the insurer, which arises only after the plan actually makes benefit payments beyond the agreed attachment point. In contrast, when a plan buys health insurance for participants and beneficiaries, the plan participants and beneficiaries have a legal claim directly against the insurance company, thereby securing the benefits even in the event of the plan's insolvency. Participants and beneficiaries in self-funded plans may not have the security of the insurance company's assets because stop-loss insurance insures the plan and not the participants.

The state's regulations fail to recognize that in a self-funded plan, with or without stop-loss insurance and regardless of the attachment point, the provision of benefits depends on the plan's solvency, whereas the provision of benefits in an insured plan depends entirely on the insurer's solvency. It is this fundamental difference that precludes the Maryland Insurance Agency from regulating self-funded plans but permits them to regulate insurance companies that provide

11

health benefits to plans for their participants. While ERISA's savings clause explicitly empowers states to adjust the obligations and incentives which bear on insurance companies' solvency, see 29 U.S.C. § 1144(b)(2)(A), the combined effect of the preemption and deemer clauses, 29 U.S.C. § 1144(a) & (b)(2)(B), is that ERISA plan solvency is the purview of federal law alone.

Maryland's stop-loss insurance regulations also directly and impermissibly affect ERISA plans' costs and choices in designing their own array of benefits. If a self-funded plan insured by stop-loss insurance having an attachment point of $5,000 provided no benefit for organ transplants, the regulations would either raise plan costs by including unwanted, state-mandated insurance coverage for organ transplants or convert the self-funded plan into a fully insured plan contrary to its preference. These effects impermissibly intrude on the relationship between an ERISA plan and its participants and beneficiaries.

While we recognize that self-funded plans may not be providing Maryland residents with the range of benefits mandated by state law and that such plans' benefits may not always be as secure as those offered by regulated insurance companies, the remedy for any such deficiency must be requested of Congress. When ERISA preempted state law relating to ERISA-covered employee benefit plans, it may have created a regulatory gap, but Maryland is without authority to fill that gap. See Greater Washington Bd. of Trade, 506 U.S. at 130-31 (D.C. workers' compensation provision requiring the provision of benefits in proportion to covered benefits of ERISA plan "relates to" and is therefore preempted by ERISA); Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 525 (1981) ("even indirect state action bearing on [ERISA plans] may encroach upon the area of exclusive federal concern"). This is not to say that Maryland may not regulate stop-loss insurance policies. Such regulation is clearly reserved to the states. See 15 U.S.C. § 1012(a) (The "business of insurance, and every person engaged therein, shall be subject to the laws of the several states"); 29 U.S.C. § 1144(b)(2) (ERISA does not preempt "any law of any State which regulates insurance" unless it deems a plan to be "an insurance company"). But because the Maryland regulation before us attempts to mandate the benefits that certain self-insured plans may offer, we affirm the judgment of the district court.

AFFIRMED

12