

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-26-2001

# Bill Gray Entr Inc v. Gourley

Precedential or Non-Precedential:

Docket 00-3412

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Bill Gray Entr Inc v. Gourley" (2001). *2001 Decisions.* Paper 93.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/93

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 26, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-3412 & 00-1400

BILL GRAY ENTERPRISES, INCORPORATED EMPLOYEE
HEALTH AND WELFARE PLAN, by Bill Gray Enterprises,
Inc., in its fiduciary capacity as plan administrator

v.

RONALD L. GOURLEY;
JUDITH L. GOURLEY;
ERIE INSURANCE EXCHANGE

       Ronald L. Gourley,
       Appellant at No. 00-3412

       Bill Gray Enterprises,
       Incorporated Employee Health
       and Welfare Plan, by Bill Gray
       Enterprises, Inc., in its fiduciary
       capacity as plan administrator,
       Appellant at No. 00-1400

On Appeal from the United States District Court
for the Western District of Pennsylvania
D.C. Civil Action No. 97-cv-00317
(Honorable Donald J. Lee)

Argued October 24, 2000

Before: BECKER, Chief Judge,
SCIRICA and FUENTES, Circuit Judges

(Filed: April 26, 2001)

ROGER L. WISE, ESQUIRE
 (ARGUED)
Heintzman, Warren, Weis & For nella
Gulf Tower, 35th Floor
707 Grant Street
Pittsburgh, Pennsylvania 15219

 Attorney for Ronald L. Gourley
and Judith L. Gourley

RICHARD B. TUCKER, III, ESQUIRE
 (ARGUED)
Tucker Arensberg
1500 One PPG Place
Pittsburgh, Pennsylvania 15222

 Attorney for Bill Gray Enterprises,
Incorporated Employee Health and
Welfare Plan, by Bill Gray
Enterprises, Inc., in its fiduciary
capacity as plan administrator

SUSAN H. MALONE, ESQUIRE
 (ARGUED)
RICHARD DiSALLE, ESQUIRE
Rose, Schmidt, Hasley & DiSalle
900 Oliver Building
Pittsburgh, Pennsylvania 15222

 Attorneys for Erie Insurance
Exchange

OPINION OF THE COURT

SCIRICA, Circuit Judge.

The principal issue on appeal is whether a self-funded employee benefit plan which purchases stop-loss insurance from a third party insurance provider is subject to Pennsylvania laws governing the enforcement of anti-subrogation clauses in insurance contracts. W e join our sister circuits in holding a self-funded employee benefit plan with stop-loss insurance is not deemed an insurance provider under the Employee Retirement Income Security

2

Act. Therefore, the plan is not subject to state laws regulating insurance contracts.

I.

A.

Bill Gray Enterprises, Incorporated Employee Health and Welfare Plan, a self-funded welfar e plan operated and administered by plaintiff Bill Gray Enterprises, Inc., is a welfare benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, 29 U.S.C. S 1001 ("ERISA"). Funded by contributions from employers and covered employees, the Plan is designed, in part, to provide medical benefits for catastrophic health car e expenses for covered persons and their dependants. The Plan engaged Diversified Group Administrator, Inc. to process certain claims. It also purchased stop-loss insurance 1 from the Insurance Company of North America to cover benefit payments exceeding $40,000. Through a subr ogation and reimbursement clause in the Plan document, the Plan retained rights of subrogation and r eimbursement against all Plan participants and third parties for medical benefits paid by the Plan. The Plan document's subrogation clause provides in part:

> RIGHT OF SUBROGATION AND REIMBURSEMENT
>
> When this provision applies. The Cover ed Person may incur medical or other charges due to Injuries for which benefits are paid by the Plan. The Injuries may be caused by the act or omission of another person. If so, the Covered Person may have a claim against that other person or third party for payment of the medical or other charges. The Plan will be subr ogated to all rights the Covered Person may have against that other person or third party and will be entitled to reimbursement.

_____

1. The Insurance Company of North America policy calls this "excess-loss insurance." For our purposes here, the ter ms are interchangeable. Because most courts describing this type of insurance have called it "stop-loss insurance," we will employ that ter m.

The Covered Person must:

(1) assign or subrogate to the Plan his or her rights to recovery when this provision applies;

(2) authorize the Plan to sue, compromise and settle in the Covered Person's name to the extent of the amount of medical or other benefits paid for the Injuries under the Plan and its expenses incurr ed by the Plan in collecting this amount;

(3) reimburse the Plan out of the Recovery made from the other person, the other person's insur er or the third party the amount of medical or other benefits paid for the Injuries under the Plan and the expenses incurred by the Plan in collecting this amount; and

(4) notify the Plan in writing of any proposed settlement and obtain the Plan's written consent before signing any release or agreeing to any settlement.

Amount subject to subrogation or r eimbursement. All amounts recovered will be subject to subrogation or reimbursement. In no case will the amount subject to subrogation or reimbursement exceed the amount of medical or other benefits paid for the Injuries under the Plan and the expenses incurr ed by the Plan in collecting this amount.

When a right of recovery exists, the Cover ed Person will execute and deliver all required instruments and papers, including a subrogation agreement provided by the Plan, as well as doing whatever else is needed, to secure the Plan's rights of subrogation and reimbursement, before any medical or other benefits will be paid by the Plan for the Injuries. If the Plan pays any medical or other benefits for the Injuries before these papers are signed and things are done, the Plan will still be entitled to subrogation and reimbursement. In addition, the Covered Person will do nothing else to prejudice the right of the Plan to subrogate and be reimbursed.

4

Defined Terms:

"Recovery" means monies paid to the Cover ed Person by way of judgment, settlement, or otherwise to compensate for all losses caused by, or in connection with, the Injuries.

"Subrogation" means the Plan's right to pursue the Covered Person's claims for medical or other charges paid by the Plan against the other person, the other person's insurer and the third party.

"Reimbursement" means repayment to the Plan for medical or other benefits that it has paid towar d care and treatment of the Injury and for the expenses incurred by the Plan in collecting this benefit amount.

Recovery from another plan under which the Covered Person is covered. This right of reimbursement also applies when a Cover ed Person recovers under an uninsured or underinsur ed motorist plan, homeowner's plan, renter's plan or any liability plan.

B.

On January 23, 1995, defendant Ronald. L. Gourley was severely injured when his automobile was struck by an uninsured drunk driver operating a stolen vehicle. Employed by Massey Buick, GMC, Inc. in Pittsbur gh, Mr. Gourley was a participant in the Bill Gray Plan. The Plan, through its claims processor Diversified Group Administrator, Inc., paid $141, 401.35 to medical providers for Mr. Gourley's entire medical expenses. Through its own funds, the Plan paid the first $40,000; under the Plan's stop-loss policy, the Insurance Company of North America provided the Plan the remainder of the funds.

Mr. Gourley sued the tavern that served alcoholic beverages to the drunk driver. A jury awar ded him $1,182,500 for his injuries and his wife, Judith Gourley, $67,500 for loss of consortium. But the taver n did not have Dram Shop insurance and filed for bankruptcy after the

5

verdict. It is uncontested that the Gourleys have been unable to collect this judgment.

The Gourleys submitted a claim for uninsured motorist benefits to their personal automobile insurance carrier, Erie Insurance Exchange. After executing a release r epresenting that none of the payment was for accident incurr ed medical expenses, the Gourleys received $300,000 in uninsured motorist benefits, the maximum under their joint policy. But prior to payment, the Plan notified the Gourleys and Erie Insurance Exchange of its claim for subr ogation and reimbursement. Neither the Gourleys nor Erie Insurance Exchange reimbursed the Plan by any amount.

C.

Through its fiduciary, Bill Gray Enterprises, the Plan filed suit under its subrogation/reimbursement clause to recoup the $141, 401.35 in medical benefits it paid Mr . Gourley. The Gourleys maintained the Plan was ineligible for reimbursement because the Pennsylvania Motor V ehicle Financial Responsibility Law bars insurance carriers from obtaining reimbursement or subrogation payments in suits arising from motor vehicle accidents.[2] Contending it was not an insurance carrier but a self-funded employee benefit plan, the Plan maintained the Pennsylvania Motor V ehicle Financial Responsibility Law was preempted by ERISA. Furthermore, it argued that under the Plan document's unambiguous language, as interpreted by the administrator, it was entitled to reimbursement from all recoveries obtained from third parties.

_____

2. Section 1720 of the Pennsylvania Motor V ehicle Financial Responsibility Law provides:

> In actions arising out of the maintenance or use of a motor vehicle,
> there shall be no right of subrogation or reimbursement from a
> claimant's tort recovery with respect to workers' compensation
> benefits, benefits available under section 1711 (relating to required
> benefits), 1712 (relating to availability of benefits) or 1715 (relating
> to availability of adequate limits) or benefits paid or payable by a
> program, group contract or other arrangement whether primary or
> excess under section 1719 (relating to coor dination of benefits).

75 Pa.C.S.A. S 1720 (West 1996).

6

To the extent the Plan had a right to subrogation, Erie Insurance Exchange argued the right was subject to the defenses it could raise against the subrogors (the Gourleys). Because Erie Insurance Exchange had paid the maximum contractual benefits to the Gourleys, it maintained it had a complete defense to the Plan's suit. In addition, Mrs. Gourley maintained she was not required to reimburse the Plan for the uninsured motorist benefits she received under her Erie Insurance Exchange policy which jointly covered both her and her husband.

The District Court held the Plan was an uninsured employee benefit plan and under ERISA was not subject to the Pennsylvania insurance anti-subrogation law. Because the Plan document, as interpreted by the Plan administrator, was unambiguous and reasonable, the District Court held the Plan was entitled to reimbursement from payments received from third parties.3 The District Court also held Mrs. Gourley was not covered under the Plan document's reimbursement clause and therefore was not personally liable to reimburse the Plan from the joint benefits received under the Erie Insurance Exchange policy. Finally, it held the Plan could not seek payments under its subrogation clause from Erie Insurance Exchange because

_____

3. The Plan also sought an award for prejudgment interest on the amounts it was entitled to receive under the subrogation/ reimbursement clause of the Plan document. The District Court denied this award stating that it would be "unfair and inequitable to add any pre-judgment interest to the award of $141, 401.35 already imposed on Mr. Gourley." Bill Gray Enter., Inc. Employee Health and Welfare Planv. Gourley, CA. No. 97-317, slip op. at *3 (W .D. Pa. May 19, 1999) (citing Anthuis v. Colt Indus. Operating Corp., 971 F .2d 999, 1009 (3d Cir. 1992) ("The awarding of prejudgment interest under ERISA is within the district court's discretion, `given in response to considerations of fairness
and denied when its exaction would be inequitable.' "). The District Court reasoned that Mr. Gourley's refusal to reimburse the Plan was not motivated by bad faith nor was it unreasonable in the context of the complicated ERISA scheme. Recognizing Mr. Gourley sustained life altering injuries, the court held in balancing the equities it would be unfair to impose prejudgement interest payments on him. Id. We hold the District Court did not abuse its discretion and will affirm. See Anthuis, 971 F.2d at 1009-10.

7

Erie had already paid its contractually obligated claims directly to Mr. Gourley. This appeal followed.

II.

The District Court had subject matter jurisdiction under 28 U.S.C. S 1331, and 29 U.S.C. S 1132 (e)(1). We have appellate jurisdiction under 28 U.S.C. S 1291. We exercise plenary review over the District Court's grant of summary judgment. Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996).

III.

A.

The ERISA preemption clause, 29 U.S.C. S1144(a), provides:

> Except as provided in subsection (b) of this section [the saving clause], the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or her eafter relate to any employee benefit plan . . . .

Courts have interpreted ERISA's preemption clause broadly, noting Congress' intention to make ERISA "an area of exclusive federal concern." FMC Corp. v. Holliday, 498 U.S. 52, 58 (1990). While ERISA broadly pr eempts state regulations of employee benefit plans, it does not preempt state laws governing insurance. The ERISA savings clause, 29 U.S.C. S 1144(b)(2)(A), provides:

> Except as provided in subparagraph (B) [the deemer clause], nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.

The ERISA deemer clause, 29 U.S.C. S 1144(b)(2)(B), provides:

> Neither an employee benefit plan . . . nor any trust established under such a plan, shall be deemed to be

8

an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law or any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.

Noting the relationship between these clauses is not a "model of legislative drafting," Metr o. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 739 (1985), the Supreme Court has nonetheless provided guidance in determining how to apply these clauses in a manner consistent with Congressional intent. In FMC Corp., the Court addressed whether S 1720 of the Pennsylvania Motor V ehicle Financial Responsibility Law4 was applicable to a self-funded ERISA health care plan. Holding the health plan was exempt from the Pennsylvania Anti-Subrogation law, the Court stated:

> We read the deemer clause to exempt self-funded ERISA plans from state laws that "regulat[e] insurance" within the meaning of the savings clause. By forbidding States to deem employee benefit plans "to be an insurance company or other insurer . . . or to be engaged in the business of insurance," the deemer clause relieves plans from state laws"purporting to regulate insurance." As a result, self-funded ERISA plans are exempt from state regulation insofar as that regulation "relate[s] to" the plans. State laws directed toward the plans are pre-empted because they relate to an employee benefit plan but are not "saved" because they do not regulate insurance. State laws that directly regulate insurance companies are "saved" but do not reach self-funded employee benefits plans because the plans may not be deemed to be insurance companies . . . .

498 U.S. at 61.

_____

4. Section 1720 of the Pennsylvania Motor V ehicle Financial Responsibility Law is the same provision that is at issue in this case. This section prohibits insurance providers from obtaining reimbursement payments from recoveries an insured r eceives from third parties in a motor vehicle accident.

Although the deemer and savings clauses make clear distinctions between employee benefit plans and insurance contracts, the Supreme Court noted,

> Employee benefit plans that are insur ed are subject to indirect state insurance regulation. An insurance company that insures a plan remains an insurer for purposes of state laws "purporting to regulate insurance" after the application of the deemer clause. The insurance company is therefore not r elieved from state insurance regulation. The ERISA plan is consequently bound by the state insurance regulations insofar as they apply to the plan's insurer .

Id.

Thus the Court concluded,

> Our interpretation of the deemer clause makes clear that if a plan is insured, a State may r egulate it indirectly through regulation of its insurer and its insurer's insurance contracts; if the plan is uninsured, the State may not regulate it.

Id. at 64.5

B.

The precise issue on appeal is whether a self-funded employee benefit plan is "insured" when it purchases stop-

_____

5. Mr. Gourley asserts recent Supr eme Court jurisprudence suggests the Court has adopted a more restrictive interpretation of ERISA preemption. See DeBuono v. NYSA-ILA Med. and Clinical Serv. Fund , 520 U.S. 806 (1997); Boggs v. Boggs, 520 U.S. 833, r eh'g denied, 521 U.S. 1138 (1997); Cal. Div. of Labor Standards Enfor cement v. Dillingham Const., N.A., Inc., 519 U.S. 316 (1997). We do not interpret these cases as signaling a general shift in ERISA preemption, especially in the context of insurance coverage. As recently as 1995 in N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645 (1995), the Supreme Court reiterated that ERISA preempts state insurance laws as they relate to employee benefit plans. Specifically addressing preemption in the context of state insurance regulations, the Supreme Court stated, "ERISA preempt[s] state laws that mandate[ ] employee benefit structures or their administration." Id. at 658 (affirming
FMC Corp., 498 U.S. 52 (1990)).

10

loss insurance. If the purchase of stop-loss coverage makes the Plan insured for the purposes of ERISA, the Plan may be "indirectly regulated" by state insurance laws. Although we have not directly addressed this issue, three courts of appeals have held the purchase of stop-loss insurance does not make a self-funded employee benefit plan "insured" for the purposes of ERISA preemption. Am. Med. Sec., Inc. v. Bartlett, 111 F.3d 358 (4th Cir. 1997), cert. denied, 524 U.S. 936 (1998); Thompson v. Talquin Bldg. Pr od. Co., 928 F.2d 649 (4th Cir. 1991); Lincoln Mut. Cas. Co. v. Lectron Prod., Inc., Employee Health Benefit Plan, 970 F .2d 206 (6th Cir. 1992); United Food & Commercial Workers & Employers Ariz. Health & Welfare Trust v. Pacyga, 801 F.2d 1157 (9th Cir. 1986); see also Drexelbr ook Eng'r Co. v. Travelers Ins. Co., 710 F. Supp. 590 (E.D. Pa.), af f 'd., 891 F.2d 280 (3d Cir. 1989); Cuttle v. Fed. Employees Metal Trades Council, 623 F. Supp. 1154 (D.Me. 1985).

We join these courts of appeals and hold the purchase of stop-loss insurance does not make a self-funded employee benefit plan an insurance carrier under ERISA's "savings clause." As other courts have recognized, stop-loss insurance is not designed to insure individual plan participants but to provide reimbursement to a plan after the plan makes benefit payments. Am. Med. Sec., Inc., 111 F.3d at 361 ("Stop-loss insurance is . . . akin to `reinsurance' in that it provides r eimbursement to a plan after the plan makes benefit payments.").

Employee benefit plans that purchase stop-loss insurance are not insuring plan participants, but insuring the plan itself in the event a catastrophic medical event requires the plan to pay out large sums to an individual participant. As the Court of Appeals for the Ninth Circuit stated,

> Stop-loss insurance does not pay benefits dir ectly to participants, nor does the insurance company take over administration of the Plan at the point when the aggregate amount is reached. Thus, no insurance is provided to the participants, and the Plan should properly be termed a non-insured plan, protected by the deemer clause . . . .

11

Pacyga, 801 F.2d at 1161–62.

When an ERISA plan purchases stop-loss insurance, it retains liability to plan participants for the full extent of their injuries. By purchasing stop-loss insurance, the plan does not delegate its fiscal liabilities or administrative responsibilities to the insurance company. In the event the stop-loss insurer or the plan becomes insolvent, the plan retains liability to plan participants even to those amounts covered under the stop-loss coverage. The Court of Appeals for the Fourth Circuit noted the significance of this fact stating, "When a plan buys health insurance for participants and beneficiaries, the plan participants and beneficiaries have a legal claim directly against the insurance company, thereby securing benefits even in the event of the plan's insolvency." Am. Med. Sec., Inc., 111 F.3d at 364.

Merely by purchasing stop-loss insurance and at the same time retaining financial responsibility for plan participants' coverage, self-funded plans may not r ely on the assets of an insurance company in the event of insolvency. See id. It follows that r eimbursement and subrogation rights are vital to ensuring the financial stability of self-funded plans. Consistent with other courts of appeals, therefore, we hold that when an ERISA plan purchases stop-loss insurance but does not otherwise delegate its financial responsibilities to another third party insurer, it remains an uninsur ed self-funded welfare plan for ERISA preemption purposes. Because stop-loss insurance is designed to protect self-funded employee benefit plans, rather than individual participants, plans purchasing stop-loss insurance are not deemed "insured" under ERISA. Am. Med. Sec., Inc., 111 F . 3d at 358; Pacyga, 801 F.2d at 1162 (self-funded ERISA plan that purchases stop-loss insurance "should pr operly be termed a non-insured plan, protected by the deemer clause"). But we recognize that a self-funded ERISA plan may purchase such a large amount of stop-loss insurance that it appears as if the plan is no longer operating as a self-funded employee benefit plan but rather effectively operating as an insurance company. In this instance the purchase of large amounts of stop-loss insurance may be evidence that the

12

plan is attempting to retain the financial security provided by insurance coverage while at the same time r eap the benefits of ERISA preemption, including the avoidance of state laws regulating reimbursement. Because there is no evidence that the Bill Gray Plan purchased an excessive amount of stop-loss insurance, we do not reach the issue whether the purchase of large amounts of stop-loss insurance effectively makes a self-funded ERISA plan an insurance company for ERISA preemption purposes.

Because the Bill Gray Plan purchased stop-loss insurance to insure the Plan from losses in the event its members suffered catastrophic injury requiring substantial medical payments, it is not an insurance provider under ERISA. Accordingly the Bill Gray Plan, as an uninsured self-funded employee benefit plan,6 is exempt from S 1720 of the Pennsylvania Motor Vehicle Financial Responsibility Law.

IV.

A.

Recognizing the Pennsylvania Motor Vehicle Financial Responsibility Law does not preclude the Plan from enforcing its subrogation and reimbursement provisions, we next turn to whether the Plan document unambiguously and reasonably requires the Gourleys to reimburse the Plan. The Plan document provides, "The Plan Administrator shall have discretionary authority to construe and interpret the terms and provisions of the Plan . . . and to decide disputes which may arise relative to a Plan Participants

_____

6. The Gourleys argue the Plan has admitted that it is not a self-funded ERISA Plan because it identified itself as an"insured welfare plan" in its 1994-1995 federal income tax filings. The District Court found this argument "disingenuous" because in the same filings the Plan stated it provided "self-funded stop-loss" insurance benefits. The District Court stated, "This entire piece of evidence, ther efore, and not just the selected excerpt taken out of context, actually supports the Plan's position that it is a self-funded plan, with stop-loss insurance." Bill Gray Enter., Inc., slip op. at *30. Having reviewed the tax for ms in question, we agree.

13

rights, and to decide questions of Plan interpr etation and those of fact relating to the Plan."

The Supreme Court has directed courts to r eview a self-funded ERISA plan's interpretation of its contracts governing benefit payments under an arbitrary and capricious standard. Firestone T ire and Rubber Co. v. Brunch, 489 U.S. 101 (1989) (holding court must review de novo company's denial of benefits unless benefit plan gives administrator or fiduciary discretionary authority to construe terms of plan in which case courts r eview a benefits denial under an arbitrary and capricious standard).7 Applying general principles of trust law, the Court stated, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a `facto[r] in determining whether there is an abuse of discretion.' " Id. at 115 (quoting Restatement (Second) of Trusts S 187, cmt. d). As recently as last year in Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 383 (3d Cir. 2000), we addressed when a self-funded plan operates under a conflict of interest, stating,

> Employers typically structure the relationship of ERISA plan administration, interpretation, and funding in one of three ways. First, the employer may fund a plan and pay an independent third party to interpr et the plan and make plan benefits determinations. Second, the

_____

7. In discussing this standard of review, the Court held that it is only applicable in actions "challenging denial of benefits based on plan interpretations." Firestone, 489 U.S. at 108. It stated, "We express no view as to the appropriate standards of r eview for actions under other remedial provisions of ERISA." Id. While Firestone does not mandate a "mechanical application" of the arbitrary and capricious standard in all cases involving ERISA plan interpretation, the arbitrary and capricious standard is appropriate in cases that involve analogous principles of trust law where a fiduciary is given discr etionary authority to interpret the language of a plan document's provisions. See Moench v. Robertson, 62 F.3d 553, 566 (3d Cir. 1995)(citing Restatement (Second) of Trusts S 187 ("Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent abuse by the trustee of his discretion.")), cert. denied, 516 U.S. 1115 (1996).

14

employer may establish a plan, ensure its liquidity, and create an internal benefits committee vested with the discretion to interpret the plan's ter ms and administer benefits. Third, the employer may pay an independent insurance company to fund, interpr et, and administer a plan . . . . [W]e have pr eviously held the first two arrangements do not, in themselves, constitute the kind of conflict of interest mentioned in Firestone.

Because the Plan did not pay the Insurance Company of North America to fund, interpret or administer the Plan, it does not fall under Pinto's third model. As noted, plans falling under this third model are generally subject to a heightened form of arbitrary and capricious r eview. But unless specific evidence of bias or bad-faith has been submitted, plans that fall under the other two models are reviewed under the traditional arbitrary and capricious standard.8 Id.

Reviewing our jurisprudence in the context of self-funded ERISA plans we stated,

While . . . there might be a risk of opportunism [in permitting a self-funded Plan to interpr et the provisions of its coverage] . . . this alone d[oes] not constitute evidence of a conflict of inter est, in part because the employer "ha[s] incentives to avoid the loss of morale and higher wage demands that could r esult from denials of benefits."

Id. at 386 (quoting Nazay v. Miller, 949 F.2d 1323 (3d Cir. 1991)).

We explained,

_____

8. In Pinto, we did not have the opportunity to consider whether other plan structures, such as those involving stop-loss insurers, may give rise to an inference of bias. Because Gourley has failed to allege bias on the part of the plan administrator due to its contractual obligation to the Insurance Company of North America to pursue subr ogation remedies, and because he has failed to set forth any other evidence of bias in the decision making process, we need not consider whether self-interest on the part of the administrator mandates a heightened standard of review.

15

The typical employer-funded pension plan is set up to be actuarially grounded, with the company making fixed contributions to the pension fund, and a provision requiring that the money paid into the fund may be used only for maintaining the fund and paying out pension [benefits] . . . . The employer in such a circumstance "incurs no direct expense as a result of the allowance of benefits, nor does it benefit directly from the denial or discontinuation of benefits." In contrast . . . the typical insurance company is structured such that its profits ar e directly affected by the claims it pays out and those it denies.

Id (internal citation omitted). at 388.

Under the Plan document, Bill Gray, as the Planfiduciary and administrator,9 was given the discretionary authority to
_____

9. The Plan document describes Bill Gray's fiduciary responsibilities as Plan Administrator as follows:

DUTIES OF THE PLAN ADMINISTRATOR

(1)- To administer the Plan in accor dance with its terms.

(2)- To decide disputes which may arise r elative to a Plan Participant's rights.

(3)- To keep and maintain the Plan documents and all other records pertaining to the Plan.

(4)- To appoint a Claims Processor to pay claims.

(5)- To perform all necessary r eporting as required by ERISA.

(6)- To establish and communicate pr ocedures to determine whether a medical child support order is qualified under ERISA Sec. 609.

The Plan document also states,

The Plan Administrator shall administer this Plan in accordance with its terms and establish its policies, interpretations, practices, and procedures. It is the express intent of this Plan that the Plan Administrator shall have discretionary authority to construe and interpret the terms and provisions of the Plan, to make determinations regarding issues which relate to eligibility for benefits, to decide disputes which may arise r elative to a Plan Participant's rights, and to decide questions of Plan interpretation

and those of fact relating to the Plan. The decision of the Plan Administrator will be final and binding on all interested parties.

16

interpret the terms of the Plan document. By instituting litigation against the Gourleys, Bill Gray interpreted the Plan document to require reimbursement from payments received under an uninsured motorist benefits policy.10 Accordingly, we review the Plan's interpretation of the Plan document under an arbitrary and capricious standard. Pinto, 214 F.3d at 378; see also United McGill Co. v. Stinnett, 154 F.3d 168, 171 (4th Cir . 1998).

B.

ERISA health plans must provide participants with a plan document that clearly explains coverage. These plan documents must

> be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.

29 U.S.C. S 1022(a).

Whether terms in an ERISA Plan document are ambiguous is a question of law. A term is "ambiguous if it is subject to reasonable alternative interpretations." Taylor v. Cont'l Group Change in Control Severance Pay Plan, 933 F.2d 1227, 1232 (3d Cir. 1991); Mellon Bank, N.A. v. Aetna Bus.

_____

10. Mr. Gourley argues that courts have de novo review of an ERISA plan fiduciary's interpretation of a plan document if the document gives the fiduciary the authority to interpret or construe the terms of the plan, but the fiduciary fails to exercise this authority. Moench, 62 F.3d at 567–68 (arbitrary and capricious standard is "appropriate only when the trust instrument allows the trustee to interpret the instrument and when the trustee has in fact interpreted the instrument"). He argues that Bill Gray failed to "deliberate[ ], discuss[ ], or interpret[ ] the Health Plan's Third Party Recovery and Subrogation provision in any formal manner prior to asserting a subrogation/reimbursement claim against Mr. Gourley." But the District Court found that "by the Gourleys' own admission . . . the Plan has been intimately involved in negotiations and the exchange of respective legal positions [regarding plan document interpretation] . . . and moreover, the Plan has initiated and filed its complaint under a theory which necessarily relies on its interpretation of the Plan." Bill Gray Enter., Inc., slip op. at *22. We agree.

17

Credit Inc., 619 F.2d 1001, 1011 (3d Cir. 1980). In determining whether a particular clause in a plan document is ambiguous, courts must first look to the plain language of document. In Re UNISYS Corp. Retir ee Med. Benefit "ERISA" Litig., 58 F.3d 896, 902 (3d Cir. 1995) ("The written terms of the plan documents contr ol . . . ."). If the plain language of the document is clear, courts must not look to other evidence. In re Unisys Corp. Long-Term Disability Plan ERISA Litig., 97 F.3d 710, 715 (3d Cir. 1996) (quoting Mellon Bank, 619 F.2d at 1013) (" `Our approach does not authorize a trial judge to demote the written word to a reduced status in contract interpr etation. Although extrinsic evidence may be considered under pr oper circumstances, the parties remain bound by the appropriate objective definition of the wor ds they use to express their intent . . . .' ")). But if the plain language leads to two reasonable interpretations, courts may look to extrinsic evidence to resolve any ambiguities in the plan document. However, "it is inappropriate to consider such [extrinsic] evidence when no ambiguity exists." Epright v. Envtl. Res. Mgmt, Inc. Health and Welfar e Plan; ERM, 81 F.3d 335, 339 (3d Cir. 1996).

To recapitulate, in reviewing a plan administrator's interpretation of an ERISA plan we must first examine whether the terms of the plan document ar e ambiguous. See generally In re Unisys Corp. Long-T erm Disability Plan ERISA Litig., 97 F.3d at 715-16. If the terms are unambiguous, then any actions taken by the plan administrator inconsistent with the terms of the document are arbitrary. But actions reasonably consistent with unambiguous plan language are not arbitrary. If the reviewing court determines the ter ms of a plan document are ambiguous, it must take the additional step and analyze whether the plan administrator's interpr etation of the document is reasonable. Spacek v. Maritime Ass'n ILA Pension Plan, 134 F.3d 283, 292 (5th Cir . 1998). In making this determination, the level of defer ence the reviewing court will accord the plan administrator's interpretation is guided by our prior discussion of Pinto. 214 F.3d at 383.

Mr. Gourley asserts the language of the Plan document is ambiguous in describing which funds are subject to

18

reimbursement and subrogation; specifically, whether reimbursement is required when a covered person receives payments that are unrelated to medical costs. Mr. Gourley contends the Plan document only requires r eimbursement for payments received from a third party for medical benefits. He cites the Plan document's definition of the term "reimbursement" which provides:"Reimbursement means repayment to the Plan for medical or other benefits that it has paid toward care and treatment for the Injury and for the expenses incurred by the Plan in collecting this benefit amount." Because the $300,000 he received fr om Erie Insurance Exchange was unrelated to his medical bills, he contends it is not subject to reimbursement.

Mr. Gourley also argues the Plan document's designation of the term "third party" thr oughout the document is ambiguous. Because the Plan does not define "third party," he maintains it is unclear whether the term includes his own insurance company, in this case Erie Insurance Exchange. See Standish v. Am. Mfr. Mut. Ins. Co., 698 A.2d 599 (Pa. Super. Ct. 1997) (holding ter m "third party" did not include an uninsured motorist carrier). He contends the Plan could have clarified the "ambiguity" by using the terms "covered person's own insurance company" rather than "third party" in order to put Plan participants on notice that recoveries from private insurance companies were subject to subrogation and reimbursement.

The District Court held the Plan document's language was not ambiguous. We agree.1 1 The Plan document
_____

11. As noted, the Plan provides:

      When this provision applies. The Cover ed Person may incur
      medical or other charges due to Injuries for which benefits are paid
      by the Plan. The Injuries may be caused by the act or omission of
      another person . . . . The Plan will be subr ogated to all rights the
      Covered Person may have against that other person or third party
      and will be entitled to reimbursement.

      The Covered Person must:

      *   *   *

      (3) reimburse the Plan out of the Recovery made from the other
      person, the other person's insurer or the thir d party the amount

explicitly requires Mr. Gourley to reimburse the Plan for any recovery received from a thir d party in relation to the accident, stating, "All amounts received will be subject to subrogation and reimbursement." A plain reading of this provision sets forth the Plan's broad right to subrogation and reimbursement.

The term "third party" is not ambiguous because the term clearly refers to any person or entity other than the Plan and the covered individual. "Thir d party" broadly refers to a variety of individuals and entities who are not "a party to a lawsuit, agreement, or other transaction." Black's Law Dictionary 1489 (7th ed. 1999). As the District Court

_____

of medical or other benefits paid for the Injuries under the Plan and the expenses incurred by the Plan in collecting this amount.

\*   \*   \*

Amount subject to subrogation or reimbursement. All amounts recovered will be subject to subrogation or reimbursement. In no case will the amount subject to subrogation or reimbursement exceed the amount of medical or other benefits paid for the Injuries under the Plan and the expenses incurr ed by the Plan in collecting this amount.

\*   \*   \*

Defined Terms:

"Recovery" means monies paid to the Cover ed Person by way of judgment, settlement, or otherwise to compensate for all losses caused by, or in connection with, the Injuries.

"Subrogation" means the Plan's right to pursue the Covered Person's claims for medical or other charges paid by the Plan against the other person, the other person's insur er and the third party.

"Reimbursement" means repayment to the Plan for medical or other benefits that it has paid toward car e and treatment of the Injury and for the expenses incurred by the Plan in collecting this benefit amount.

Recovery from another plan under which the Covered Person is covered. This right of reimbursement also applies when a Covered Person recovers under an uninsur ed or underinsured motorist plan, homeowner's plan, renter's plan or any liability plan.

noted, the term third party "in common parlance refers to a person or entity not an initial party to a suit or transaction who may have rights or obligations ther ein." Bill Gray Enter., Inc., slip op. at *15. While this provision contemplates broad rights to reimbursement, we do not believe this translates into ambiguity.

Most convincing, however, is the provision in the Plan document which provides:

> Recovery from another plan under which the Covered Person is covered. This right of reimbursement also applies when a Cover ed Person recovers under an uninsured or underinsur ed motorist plan, homeowner's plan, renter's plan or any liability plan.

A reasonable plan participant reading this language, we believe, would understand the Plan document clearly mandates any recoveries from an uninsur ed motorist plan are subject to reimbursement.12   The Plan's interpretation

_____

12. Mr. Gourley contends the District Court erred in denying his discovery request to compel the Plan to pr oduce documentation of previous claims the Plan administrator may have brought under the subrogation/reimbursement clause to r ecover amounts paid by third parties to other Plan participants. He contends that prior cases in which the Plan interpreted the subrogation/r eimbursement clause to require reimbursement from uninsured motorist benefits are relevant to examining our standard of review since prior inconsistent interpretations may evidence that the Plan failed to exercise its authority to construe the
Plan document in a uniform manner. Mr . Gourley argues that evidence of inconsistent interpretations is relevant to determining the reasonableness of the Plan's current interpretation. See Moench, 62 F.3d at 566 ("whether the [Plan] interpr eted the provision at issue consistently" is a factor in determining whether the interpretation is reasonable under the arbitrary and capricious standard). The Plan argues that previous subrogation/r eimbursement claims the Plan may have pursued against other Plan participants ar e irrelevant here because the Plan has a fiduciary responsibility to pursue repayment claims. Even if in the past the Plan failed to pursue subr ogation/reimbursement claims, the Plan contends this does not relieve it of its fiduciary responsibility to pursue its current claim against the Gourleys.

In certain cases, the discovery sought here may well be relevant. But the Plan's past interpretations have little r elevance to the current dispute

therefore was not arbitrary and capricious and the District
Court properly found the Plan was entitled to
reimbursement from the uninsured motorist benefits Mr.
Gourley received from Erie Insurance Exchange.13

_____

since the Plan document unambiguously requir es reimbursement from
uninsured motorist benefits. In r e UNISYS Corp. Retiree Med. Benefit
"ERISA" Litig., 58 F.3d at 902 (citing Hozier v. Midwest Fasteners Inc.,
908 F.2d 115, 116 (3d Cir. 1990) (the unambiguous written provisions of
a plan must control, and extrinsic evidence may not be introduced to
vary the express terms of a plan)); Stewart v. KHD Deutz of Am., Corp.,
980 F.2d 698, 702 (11th Cir.) ("Extrinsic evidence is not admissible to
contradict the terms of an unambiguous contract."), reh'g denied, 988
F.2d 1220 (1993), cert. denied, 519 U.S. 930 (1996). Under these facts,
we see no abuse of discretion. Because the Plan document
unambiguously requires reimbursement, the Plan's interpretation is not
arbitrary or capricious. See Epright, 81 F .3d at 339 ("Extrinsic evidence
may be used to determine an ambiguous ter m, however, . . . past
practice is of no significance where the plan document is clear.").

13. Mr. Gourley has asked us to for mulate a rule as a matter of federal
common law that a plan participant has no duty to r eimburse a plan
until that person has been "made whole," i.e. been fully compensated for
all injuries sustained. He contends other courts of appeals have adopted
this policy in construing ambiguous provisions in benefit plan
documents. See Sunbeam–Oster Co., Inc., Gr oup Benefits Plan for Salaried
& Non–Bargaining Hourly Employees v. Whitehurst, 102 F.3d 1368 (5th
Cir. 1996); Barnes v. Indep. Auto. Dealers Assoc. of Cal. Health and
Welfare Benefit Plan, 64 F.3d 1389, 1394 (9th Cir. 1995). But courts
have held that importing federal common law doctrines to ERISA plan
interpretation is generally inappropriate, particularly when the terms of
an ERISA plan are clear and unambiguous. Bollman Hat Co. v. Root, 112
F.3d 113, 117 n.3 (3d Cir.) (citing authorities), cert. denied, 522 U.S.
952
(1997); see also Ryan by Capria–Ryan v. Fed. Express Corp., 78 F.3d 123
(3d Cir. 1996); Cagle v. Bruner, 112 F.3d 1510, 1521 (11th Cir.)
("Because the make whole doctrine is a default rule, the parties can
contract out of the doctrine."), reh'g denied en banc, 124 F.3d 223
(1997); Cutting v. Jerome Foods, Inc., 993 F.2d 1293, 1297 (7th Cir.)
("Because . . . the make whole rule is just a principle of interpretation,
it can be overridden by clear language in the plan."), cert. denied, 510
U.S. 916 (1993); Walker v. Rose, 22 F . Supp.2d 343, 352 (D.N.J. 1998)
("This Court finds that the Plan's reimbursement language is
unambiguous, and . . . overrides the make whole rule."). As the Supreme
Court stated in Mertens v. Hewitt Assocs., 508 U.S. 248, 260 (1993),
"The authority of courts to develop a `federal common law' under ERISA
. . . is not the authority to revise the text of the statute." In Ryan, 78

C.

The District Court held Mrs. Gourley was not personally liable to reimburse the Plan for the $141,401.35 in medical benefits the Plan paid to Mr. Gourley fr om the $300,000 of uninsured motorist benefits jointly r eceived under the Erie Insurance Exchange policy. Although it found Mrs. Gourley was a "covered person" under the Plan, the Court noted she did not sustain injuries nor receive payments from the Plan for personal medical expenses. Under the ter ms of the Plan document, the Plan was not entitled to reimbursement for payments Mrs. Gourley received from thir d parties since the Plan expended no payments on her behalf.14 The Plan counters that Mrs. Gourley, as a plan participant, is "obligated to do nothing . . . to prejudice the right of the Plan to subrogate and be reimbursed," and therefore the Plan is entitled to receive the uninsur ed motorist benefits Mrs. Gourley received in relation to her husband's accident. See Heasley, 2 F.3d at 1255. But a plain reading of the Plan document does not permit the Plan to seek reimbursement from a party for whom it never expended funds under its medical coverage. Mrs. Gourley r eceived no payments from the Plan for personal injuries. Therefore, we find the District Court properly exer cised its discretion in finding the Plan's interpretation was arbitrary and capricious because the Plan document unambiguously limits recovery to individuals for whom the Plan has expended funds.

_____

F.3d at 126, we therefore stated,"straightforward language . . . [in an ERISA plan document] should be given its natural meaning."

Because we find the terms at issue in this case unambiguously require Mr. Gourley to reimburse the Plan with the proceeds of his uninsured motorist benefits, we decline to extend the make whole remedy to his claim.

14. The specific Plan provision in question provides:

    When this provision applies. The Cover ed Person may incur
    medical or other charges due to Injuries for which benefits are
paid
    for by the Plan. . . . The Plan will be subr ogated to all rights
the
    Covered Person may have against . . . other person[s] or third
    part[ies] and will be entitled to reimbursement.

23

D.

The Plan contends Erie Insurance Exchange is liable under the subrogation/reimbursement clause to reimburse the Plan for the medical benefits the Plan paid to medical providers from the proceeds of the Gourleys' uninsured motorist policy. Because Erie Insurance Exchange was on notice of the Plan's right to subrogation, the Plan maintains it should have paid the uninsured motorist pr oceeds directly to them. The District Court held Erie Insurance Exchange was not obligated to reimburse the Plan for the uninsured motorist benefits it paid to the Gourleys. We agree.

Erie Insurance Exchange was under contract with the Gourleys to pay up to $300,000 in uninsured motorist benefits. But Erie Insurance Exchange was not a party to the contract between the Plan and the Gourleys. Erie Insurance Exchange argues that its lack of a contractual relationship with the Plan defeats any dir ect claim by the Plan against it. See Cent. States, SE & SW Ar eas Health & Welfare Fund v. State Farm Mut. Auto. Insur. Co., 17 F.3d 1081 (7th Cir. 1994). But the lack of a contractual obligation between a third party insurer to an ERISA plan does not bar suit by an ERISA plan when subr ogation rights are at issue.

Erie Insurance Exchange also contends that under equitable principles of subrogation, it may pr operly assert payment in full as a defense to the Plan's suit, since it paid the entire amount of the uninsured motorist policy to the Gourleys. We agree. Subrogation is an equitable remedy. Greater N.Y. Mut. Ins. Co. v. N. River Ins. Co., 85 F.3d 1088 (3d Cir. 1996). When a subrogee [the Plan] sues a third party [Erie Insurance Exchange], it [the Plan] steps into the shoes of the subrogor [the Gourleys] and the third party [Erie Insurance Exchange] may properly assert any defenses against the subrogee [the Plan] that it would normally have against the subrogor [the Gourleys]. Steamfitters Local Union No. 420 Welfar e Fund v. Phillip Morris, Inc., 171 F.3d 912 (3d Cir . 1999), cert. denied, 528 U.S. 1105 (2000); Puritan Ins. Co. v. Canadian Universal Ins. Co., Ltd., 775 F.2d 76 (3d Cir . 1985).

24

Under subrogation law, if a tortfeasor or a tortfeasor's insurer settles with an injured party with knowledge of an insurer's subrogation rights, the subr ogation rights remain. 16 Couch on Insurance 2d (Rev. ed.) S 61:201; see also generally Gibbs v. Hawaiian Eugenia Corp., 966 F .2d 101, 106 (2d Cir. 1992). Although a third party may generally assert any defense it has against the subrogor to the subrogee, this right does not exist when ther e is evidence of fraud between the subrogor and the thir d party that is intended to defeat the subrogee's rights.15 Wendy's Int'l, Inc. v. Karsko, 94 F.3d 1010, 1014 (6th Cir . 1996) ("The [subrogation] doctrine was created to prevent wrongdoers from shirking their liability by settling with a subrogor, thereby successfully avoiding obligations to a subrogee."). When there is evidence of fraud between the subrogor and the third party that is intended to defeat subr ogation rights, it is inequitable to permit the thir d party to assert payment in full as a defense to the subrogee's suit. Wendy's Int'l, 94 F.3d at 1014.

Here, there is no evidence of fraud. Erie Insurance Exchange settled with the Gourleys for the full amount of the uninsured motorist benefits coverage. There is no evidence to support the claim that this payment was made for the fraudulent purpose of interfering with or prejudicing the Plan's right to subrogation.16  The payment of the

_____

15. Although previous applications of this doctrine have generally been limited to situations involving a tortfeasor or a tortfeasor's insurance company, we believe similar equitable principles apply to Erie as the Gourleys' uninsured motorist insurer. See generally Wendy's Int'l,94 F.3d at 1014. Therefore, we believe it is appropriate to extend this doctrine to the facts of this case. See generally Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co., 767 F.2d 43, 45 (3d Cir. 1985) ("The general rule in the United States is that a subr ogee is not limited to asserting claims against third party wr ongdoers, but may assert a claim against the subrogor's contractual obligor as well.").

16. If an insurance company pays reduced benefits to an insured knowing the proceeds will be applied to r eimbursing an ERISA plan for benefit payments (i.e. if Erie Insurance Exchange paid less than the $141,401.35 the Plan expended for Mr. Gourley's medical expenses even though it was required to pay $300,000 under the terms of the uninsured motorist plan), the reduced payment may be sufficient to support a finding of fraud on the subrogee.

25

$300,000 to the Gourleys does not prevent the Plan from recovery since the Plan may still assert its right to the proceeds of the Erie Insurance Exchange policy. Because of the absence of fraud in the payment of the uninsur ed motorist benefits, it is not inequitable to per mit Erie Insurance Exchange to assert payment in full in r esponse to the Plan's suit.

The District Court properly held Erie Insurance Exchange was not liable to reimburse the Plan with the proceeds of the Gourleys' uninsured motorist benefit's policy.

V.

For the foregoing reasons, we will affir m the judgment of the District Court.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

26