PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-3936
_____

ROBERT FUNK

v.

CIGNA GROUP INSURANCE; LUCENT
TECHNOLOGIES, INC.; LUCENT TECHNOLIGIES INC.,
LONG TERM DISABILITY PLAN FOR MANAGEMENT
EMPLOYEES,

CONNECTICUT GENERAL LIFE INSURANCE
COMPANY, improperly pleaded as "CIGNA Group
Insurance"; ALCATEL-LUCENT USA, INC., formerly
known as Lucent Technologies, Inc.; THE LUCENT
TECHNOLOGIES INC., LONG TERM DISABILITY PLAN
FOR MANAGEMENT OR LBA  EMPLOYEES, improperly
pleaded as "Lucent Technologies, Inc. Long Term Disability
Plan for Management Employees,"

                                        Appellants.
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-08-cv-05208)

District Judge:  Hon. Faith S. Hochberg
_____

Argued
June 21, 2011

Before:   CHAGARES, JORDAN and GREENAWAY, JR.,
*Circuit Judges*.

(Filed: August 4, 2011)
_____

Robert P. Lesko   [ARGUED]
Karen Denise Peck
Wilson, Elser, Moskowitz, Edelman & Dicker
33 Washington Street, 17th Floor
Newark, NJ  07102

Jay P. Symonds
Wilson, Elser, Moskowitz, Edelman & Dicker
260 Franklin Street, 14th Floor
Boston, MA  02110
        *Counsel for Appellants*

Steven Gaechter    [ARGUED]
McCarter & Gaechter
58 Main Street
Hackensack, NJ   07601
        *Counsel for Appellee*
_____

OPINION OF THE COURT
_____

2

JORDAN, *Circuit Judge*.

This case arises out of a decision by Connecticut General Life Insurance Company ("CIGNA"), as the third-party administrator of "The Lucent Technologies, Inc. Long Term Disability Plan for Management or LBA Employees" (the "Plan"),[1] to deny Alcatel-Lucent USA, Inc. ("Lucent") employee Robert Funk's claim for long-term disability benefits under the Plan. Funk challenged that decision in the United States District Court for the District of New Jersey pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). The District Court granted summary judgment for Funk on both his claim for long-term disability benefits and on CIGNA's counterclaim under ERISA to recover overpaid benefits.

CIGNA and the other appellants appeal from that decision and order.[2] For the following reasons, we will vacate the District Court's order and remand with respect to CIGNA's denial of benefits, and we will reverse the District Court's order with respect to CIGNA's counterclaim for overpaid benefits.

---

[1] In their briefs, the parties identify CIGNA Group Insurance as the Plan administrator. (*See* Appellants' Opening Brief at 3; Appellee's Answering Brief at 1.) The Plan itself, however, states that the "Administrator for the Plan is Connecticut General Life Insurance Company (CIGNA)." (App. 2 at 178.)

[2] For ease of reference, we will refer to all of the appellants collectively as "CIGNA."

## I.    Background

### A.    *The Parties And The ERISA Plan At Issue*

Funk worked as a member of Lucent's technical staff.[3] At all times relevant to this appeal, he was a participant in Lucent's Plan, which was governed by ERISA and self-funded by Lucent through a trust. CIGNA administered the Plan. As Plan administrator, CIGNA had "full discretionary authority and power to … determine eligibility for [Plan] benefits [and] to interpret and construe the terms and provisions of the [Plan]." (App. 2 at 585.)

Pursuant to the Plan, a participant could be eligible to receive long-term disability ("LTD") benefits after he had received short-term disability benefits for 26 weeks. The Plan provided LTD benefits in two phases. Phase one began immediately after the 26-week short-term disability period and ran for one year. To receive LTD benefits for that one-year period, the putatively disabled participant had to show that he was

> prevented by reason of such disability, other than accidental injury arising out of and in the course of employment of the Company, from engaging in his … occupation or employment at the Company, for which the Eligible Employee is qualified, based on training, education or experience.

---

[3] Funk's job involved testing computer software and hardware as part of product development.

4

(App. 2 at 167.) However, for a Plan participant to receive LTD benefits beyond the one-year period, i.e., to move on to phase two, CIGNA, "in [its] sole opinion [as] the [Plan] Administrator," had to be persuaded that the participant was

> incapable of performing the requirements of any job for any employer for which the individual is qualified or may reasonably become qualified by training, education or experience, other than a job that pays less than 60 percent of the Eligible Employee's Eligible Pay that would have been in effect on the day preceding the day that the Eligible Employee's Short Term Disability Benefits ceased.

(*Id.*)

The Plan also provided that LTD benefits could be reduced by certain offsets, including Social Security disability benefits. Pursuant to the Plan, "[a]ny retroactive award of Social Security benefits which covers any portion of the period for which Plan benefits have been paid shall be considered as an offset of such Plan benefits and be payable to [CIGNA] by the recipient." (App. 2 at 172.)

### B. CIGNA's Denial Of Funk's Claim For Phase Two LTD Benefits

On December 7, 2004, Funk began a leave of absence due to depression and related disorders. In August 2005, after receiving short-term disability benefits for 26 weeks, Funk

5

applied to CIGNA for LTD benefits.[4] In support of his application, Funk submitted a claim form and the treatment records from his mental healthcare providers, Dr. Pinchuck, his psychiatrist, and Mr. Libby, his psychotherapist.[5] Funk's submissions indicated that he had a history of alcohol abuse and had been experiencing stress from his financial situation and his relationship with his wife. Pinchuck's and Libby's treatment notes described Funk as suffering from, among other things, depression, anxiety, and paranoia. The notes indicated that Funk had difficulty concentrating, making decisions, and otherwise performing daily tasks. Both Pinchuck and Libby opined that Funk was unable at that time to return to work in his former position.

CIGNA forwarded Funk's treatment records to Dr. Mohsin Qayyum for independent review. Qayyum opined that the information provided to him supported the conclusion that, "due to severe psychiatric symptoms[,]" Funk could not return to work. (App. 2 at 436.) Accordingly, Funk was awarded LTD benefits for a one-year period retroactive to June 28, 2005.

---

[4] It is undisputed that Funk was an "Eligible Employee" under the Plan and that his eligible pay prior to the date of his disability was $78,100.

[5] Funk also listed Drs. Katz and Lederich as treating physicians, but they treated, respectively, chronic headaches and sleep difficulties, and neither provided information that the parties treat as significant to Funk's claim that he was unable to work.

In June 2005, Funk executed an agreement providing that his LTD benefits under the Plan were to be reduced by any Social Security benefits he ultimately received and that he would reimburse CIGNA "for any LTD overpayment … that may occur as a result of" having received Social Security benefits. (App. 2 at 566.) In August 2005, he executed a similar agreement (together with the June 2005 agreement, the "Reimbursement Agreements").

In January 2006, CIGNA notified Funk that it would again be reviewing his case to determine if he would remain eligible for benefits beyond the phase one period. The review required Funk to complete a disability questionnaire and to provide current treatment information from his mental healthcare providers.

Funk submitted the questionnaire, listing bad tremors, lack of concentration, tiredness, short-term memory loss, aggression, depression, and paranoia as reasons why he could not return to work. Libby provided notes from therapy sessions, including observations that Funk's relationship with his wife had improved, that he was "communicating his feelings much clearer," that he had "been able to use the skills learned in session to manage his depression – which is now under control," and that he had "continue[d] to improve but need[ed] regular sessions [and] proper med[ication] to avoid regression." (App. 2 at 426.) Libby also reported that Funk was still suffering from confusion, depression, helplessness, and hopelessness and could not at that time return to work. Pinchuck did not provide updated treatment notes, stating that they were "sent before" and that "you can't read my handwriting anyway." (App. 2 at 374.) He instead provided an updated evaluation of Funk, which indicated that Funk was

7

not abusing substances and that he exhibited fair judgment and insight along with "grossly intact" cognition. (*Id.* at 375.) However, Pinchuck also indicated that Funk still suffered from depression and anxiety, scored a 40 on the Global Assessment of Functioning ("GAF")[6], exhibited limited capacity to socialize and perform daily tasks, and was unable to return to work.

CIGNA again enlisted Qayyum to independently review Funk's claim. On August 15, 2006, after reviewing Funk's supplemental information, Qayyum issued a report concluding that, while the records showed Funk to be suffering from psychiatric symptoms, they did not show that those symptoms were severe or that he had "severe functional limitations in … psychosocial domains." (*Id.* at 367.) Given that, and considering Funk's "fair insight and judgment," "grossly intact" cognition, and within-normal-limits "thought process and content," (*id.*) Qayyum opined that the "entirety … of [the] available information [did] not provide evidence

---

[6] The GAF is a numeric rating used by mental health practitioners to measure the functional impairment of a patient on a 0-100 scale in accordance with the *Diagnostic and Statistical Manual of Mental Disorders*. *See* AM. PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed., 2000). A score of 40 represents "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work …)." *Id.*

of psychiatric functional impairment to preclude" (*id.* at 368) Funk from working.

On August 16, 2006, the day after issuing his report, and after having made several unsuccessful attempts to contact Pinchuck for a peer-to-peer discussion about Funk, Qayyum finally spoke with Pinchuck. During that conversation, which Qayyum later memorialized in notes, Pinchuck suggested that Funk might be able to work in a "menial job, such as mopping floors or working at a post office at night." (*Id.* at 363.) Qayyum declined to speculate as to a suitable vocation but responded, echoing his report, that Funk was not "functionally impaired from working in a supportive, low stress, low cognitive demand environment," as evidenced by, *inter alia*, his ability to use a computer and daily check his email. (*Id.*)

Also during that conversation, Pinchuck revealed that he had referred Funk to a neuropsychologist, Dr. Robert Pancza, for an evaluation in March 2006. Pancza's evaluation, the results of which Pinchuck later faxed to Qayyum, consisted of a battery of tests administered over two days. From that evaluation, Pancza observed:

> [Funk] was pleasant and cooperative throughout th[e] examination. An appropriate amount of effort was applied to all tasks, without any signs of frustration. There was no noted tendency toward mental fatigue, distractibility, impulsivity, or lapses in concentration. All instructions were understood without difficulty. There were no indications that any affective factors, including anxiety or depression, were

9

present at a level sufficient to diminish his functional level during the course of th[e] examination. Mood was noted to be normal and affect was well modulated throughout th[e] examination.

(*Id.* at 355.) The test results indicated that Funk enjoyed average to high function in most cognitive areas. Summarizing the evaluation, Pancza stated:

> [T]here is a disparity between [Mr. Funk's] self-report of everyday cognitive functioning and the objective results of this examination. There is a growing body of research that has indicated that individuals who are depressed often significantly underestimate the quality of their cognitive functioning. Such appears to be the case for Mr. Funk. … [I] … reassured [Mr. Funk] about being capable of performing occupational activities based solely upon his current cognitive abilities.

(*Id.* at 357.)

On August 22, 2006, CIGNA notified Funk via letter that he was no longer disabled as defined under the Plan and so would not receive further LTD benefits. Explaining its decision, CIGNA acknowledged Pinchuck's opinion that Funk still suffered from depression, bi-polar disorder, anxiety, and paranoia and so was unable to work. However, it noted Pinchuck's observations that, as of July 25, 2006, Funk was "alert and oriented" and exhibiting "good" behavior, that he had thought process and content "within normal limits," had "fair" judgment and insight and "grossly

10

intact" cognition, and had stopped drinking alcohol. (*Id.* at 358-59.) Echoing Pinchuck's opinion, CIGNA noted that Funk's "ongoing severe depressive symptoms" made it difficult to get "a clear picture of [Funk's] cognitive problems" but noted too that Panzca's testing revealed "no gross cognitive defects." (*Id.* at 359.) Finally, CIGNA noted that Funk was able daily to use a computer to check email. From the foregoing, CIGNA concluded that "there is no clinical evidence to support that [Funk] would be unable to work in a supportive, low stress, low cognitive demand environment." (*Id.*) CIGNA closed the letter by informing Funk of his right to administratively appeal the decision and to include additional information for CIGNA to consider.[7]

Funk appealed to CIGNA for further review of his case. He contended that Qayyum's report and notes, which CIGNA cited in denying benefits, were at odds with the medical documentation provided by Pinchuck and Libby. Funk also noted that CIGNA failed to perform any sort of vocational assessment to determine whether he could, in his mental condition, "reasonably become qualified by training, education or experience, and earn 60% of his pre-disability pay," (*id.* at 316) which, Funk contended, not only made hollow CIGNA's conclusion that he "[was] not functionally impaired from working in a supportive, low stress, low cognitive demand environment," but also constituted noncompliance with the terms of the Plan, since "disability"

---

[7] It appears that CIGNA, in denying benefits, had reviewed Qayyum's summary of his conversation with Pinchuck, in which the Pancza evaluation was discussed, but had not reviewed the Pancza evaluation itself.

under the Plan could only be determined in light of a vocational assessment (*id.* at 315).

Funk included as additional information in support of his appeal a letter from the Social Security Administration that indicated that his application for disability benefits was being reviewed and that, based on the submitted information, Funk appeared to "need help managing [his] money and meeting [his] daily needs." (*Id.* at 317.) Funk subsequently supplied a medical questionnaire completed by Libby on February 11, 2007, indicating that Funk's GAF score was 45/50,[8] that his response to treatment over the last three years had been "fair to poor," that his decision-making, stress tolerance, and performance were hindered by confusion, fatigue, dysphoric mood, and depression, that he had "marked" functional limitation in daily activities, social functioning, and concentrating, and that "at present [his] depressive symptoms hinder sustained, gainful employment." (*Id.* at 304, 306-07, 309.) Nevertheless, Libby also indicated in the questionnaire that, contrary to the Social Security Administration's opinion, Funk "[could] … manage benefits in his … own best interest." (*Id.* at 309.)

---

[8] That GAF score represents "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." AM. PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed., 2000).

In January 2007, while his appeal to CIGNA was pending, Funk was awarded Social Security disability benefits, retroactive to June 1, 2005. That retroactive Social Security award created a period in which Funk received both Social Security and LTD benefits, meaning that, under the Plan, he had been overpaid and was obligated to reimburse CIGNA the overpaid amount, which was $24,817. Funk paid CIGNA $18,500, but spent the remaining $6,317 on ordinary living expenses. Despite notice from CIGNA, Funk did not pay the balance owed.

Having received Funk's additional submissions in support of his appeal, CIGNA forwarded all of the medical documentation that had previously been submitted with Funk's claim to Dr. Stuart Shipko for an independent review. After reviewing those records, Shipko concluded that Funk's medical history did not support any restrictions or limitations on his working. Shipko opined that Pinchuck's assessment "lack[ed] credibility," citing two reasons. (*Id.* at 299.) First, Shipko believed that Pinchuck had, in his phone conversation with Qayyum, mischaracterized Pancza's neuropsychological testing. In particular, Shipko was troubled that Pinchuck had said the test results did "not provide a clear assessment of [Funk's] cognitive problems due to [Funk's] ongoing severe depressive symptoms" and that follow-up testing was needed, despite Pancza having stated in his report that "emotional factors were not causing any cognitive impairment … [or] interfering with effort or testing of cognition in any manner." (*Id.* at 298.) Second, according to Shipko, Pinchuck had "indicate[d] that [Funk] ha[d] marginal cognitive abilities," had "poor grooming and hygiene," and was "still severely depressed," though Pancza had stated in his report that Funk "was pleasant and cooperative throughout his examination,"

13

"had a normal mood and affect," and applied "an appropriate amount of effort … [without a] tendency toward mental fatigue, distractibility, impulsivity or lapses in concentration." (*Id.* at 298-99.)

Shipko similarly criticized Libby's opinion that Funk could not work, observing that it was at odds with Libby's own treatment notes, which, Shipko said, "indicate[d] that depression is under control and d[id] not indicate that [Funk] [was] reporting any problems with cognition or serious symptoms of depression." (*Id.* at 299.) Shipko also noted that Libby conducted no formal cognition tests and that his report was inconsistent with Pancza's evaluation. Shipko closed his review thusly: "Available information does not support an inability to work in any occupation for which he is suited." (*Id.* at 300.)

CIGNA subsequently denied Funk's appeal. Citing Shipko's and Pancza's evaluations, and giving no "deference to prior reviews," CIGNA noted that Pinchuck's and Libby's opinions were at odds with their own treatment notes and Pancza's evaluation. (*Id.* at 289.) CIGNA concluded that it had "not received medical information demonstrating a severity in [Funk's] condition supporting restrictions preventing [him] from performing [his] own or any occupation." (*Id.*)

Funk again appealed within CIGNA, this time submitting a copy of Shipko's report marked up with Libby's handwritten comments. Libby noted errors he believed Shipko had made in chronicling Funk's treatment and opined that Pancza's evaluation was misleading because it was done in a controlled environment and that Funk's then-current

14

status did not support Shipko's conclusion that Funk was able to work.

On February 6, 2008, CIGNA issued a final decision denying Funk's LTD claim. Noting in particular a lack of clinical evidence or documentation to support Libby's opinion, CIGNA stated that it "had not been provided with the clinical evidence to support a physical or psychiatric functional loss which would preclude [Funk] from performing his regular occupation." (*Id.* at 186.)

## C. *Proceedings In The District Court*

On October 22, 2008, having exhausted his administrative appeals, Funk sued CIGNA pursuant to 29 U.S.C. § 1132(a)(1)(B), seeking under ERISA to overturn CIGNA's denial of LTD benefits. CIGNA countersued pursuant to 29 U.S.C. § 1132(a)(3), seeking under ERISA to recover from Funk the remaining $6,317 of overpaid LTD benefits. The parties filed cross motions for summary judgment, and, on August 30, 2010, the District Court granted Funk's motion and denied CIGNA's. With respect to the denial of benefits, the Court held that CIGNA had acted arbitrarily and capriciously because, as an initial matter, it had failed to assess whether Funk was disabled as defined under the Plan; that is, it had failed to assess whether Funk could work in a job that would pay him 60% of his former wage (a "60% job"), given the restrictions identified in CIGNA's initial denial (low stress environment, etc.). In the alternative, the Court held that CIGNA's denial of benefits was not supported by substantial evidence as set forth in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008), because CIGNA had (1) failed to reconcile its decision with the Social

15

Security Administration's award of disability benefits; (2) given greater weight to non-treating physicians' opinions without explanation; (3) issued the initial denial without having reviewed Pancza's report; (4) confused cognition with mental illness in determining Funk's ability to be productive at work; and (5) exhibited a financial conflict of interest in administering the Plan. With respect to CIGNA's counterclaim for recoupment of overpaid benefits, the Court held that an equitable lien over the Social Security funds, which is the relief CIGNA sought, was not possible here since those funds had been dissipated prior to suit and could not be traced.

CIGNA's timely appeal to us followed.

## II.   Standard of Review[9]

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002). Applying that standard, we exercise plenary review of a district court's grant of summary judgment. *Id.*

In determining whether benefits under a plan governed by 29 U.S.C. § 1132(a)(1)(B) were properly denied, we

---

[9] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). We have jurisdiction pursuant to 28 U.S.C. § 1291.

review for abuse of discretion.[10] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Glenn*, 554 U.S. at 115-17. Because "benefits determinations arise in many different contexts and circumstances, … the factors to be considered [in reviewing a plan administrator's exercise of discretion] will be varied and case-specific." *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 526 (3d Cir. 2009) (internal quotation marks omitted). While a plan administrator's potential conflict of interest may be among those case-specific factors, courts should not give that factor undue weight but should instead treat it as one of the several factors that may be relevant in the case. *See id.* (instructing that courts should "take account of several different considerations of which a conflict of interest is one, and reach a result by weighing all of those considerations" (internal quotation marks omitted)). A court may overturn a plan administrator's determination "if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009). A decision is also subject to judicial correction when the plan administrator has failed to comply with the procedures required by the plan. *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 41 (3d Cir. 1993), *abrogated in part on other grounds by Glenn*, 554 U.S. at 112.

---

[10] "In the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 n.2 (3d Cir. 2011).

17

## III. Discussion

This appeal raises the question of whether CIGNA complied with its own Plan and relied on substantial evidence in denying LTD benefits to Funk. It also requires us to address whether CIGNA may assert an equitable lien on Funk's Social Security benefits such that it may recoup an overpayment of benefits. We discuss each of those issues in turn.

### A. CIGNA's Denial Of LTD Benefits

The District Court held that CIGNA abused its discretion in denying Funk phase two LTD benefits because CIGNA failed to comply with the Plan in determining "disability" and because its decision, which did not give proper consideration to the evidence and was infected by a conflict of interest, was not supported by substantial evidence. We disagree with the former conclusion and cannot accept the District Court's analysis as to the latter.

### 1. Whether CIGNA Complied With the Plan

The District Court concluded that, because CIGNA's decision did not explicitly address salary or provide examples of suitable alternative 60% jobs, CIGNA failed to comply with the Plan provision requiring it to determine whether Funk was "incapable of performing the requirements of any job for any employer … for which the individual is qualified or may reasonably become qualified … , other than a job that

18

pays less than 60 percent [of his former pay]."[11] (App. 2 at 167.) CIGNA argues that it was not required to explicitly

[11] The District Court's opinion appears to focus on CIGNA's initial decision rather than its final decision. For example, the District Court, in holding that CIGNA had failed to comply with the Plan, highlighted CIGNA's failure to identify a 60% job that Funk could do, given his work limitations, even though the final decision indicates that Funk has no work limitations. Similarly, the District Court criticized CIGNA for basing its decision on Funk's "intact computational skills" without explaining how those skills qualify him for a 60% job, even though the final decision made no mention of those skills. The Court's emphasis was misplaced.

A plan administrator's final, post-appeal decision should be the focus of review. *See, e.g.*, 29 C.F.R. § 2560.503-1(h) (requiring that claimants subject to adverse benefit determinations be provided with a "reasonable opportunity" to appeal that adverse decision); 29 C.F.R. § 2560.503-1(h)(2)(i)-(ii) (requiring that claimant be provided appropriate notice and an opportunity to submit documentation and evidence supporting his or her claim); 29 C.F.R. § 2560.503-1(h)(2)(iv) & (3)(ii) (requiring that the plan administrator's review must "take[] into account all [additional information] … without regard to whether such information was submitted or considered in the initial benefit determination," "not afford deference to the initial adverse benefit determination," and be "conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual"). To focus elsewhere would be inconsistent with ERISA's exhaustion

discuss salary and alternative 60% jobs because it had authority under the Plan to reasonably interpret Plan provisions, and it was reasonable to interpret the Plan as not requiring an analysis of alternative 60% jobs when it had determined that Funk could return to his former job.

ERISA plans commonly grant authority to plan administrators to interpret the plan's terms. *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 441 (3d Cir. 2001). Even so, plan administrators do not have unfettered discretion in undertaking that task.

---

requirement. *See LaRue v. DeWolff, Boberg & Assocs.*, *Inc.*, 552 U.S. 248, 258-259 (2008) (noting that claimants must "exhaust the administrative remedies mandated by ERISA § 503, 29 U.S.C. § 1133, before filing suit under § 502(a)(1)(B)"); *Metropolitan Life Ins. Co. v. Price*, 501 F.3d 271, 280 (3d Cir. 2007) (similar).

A court may of course consider a plan administrator's pre-final decisions as evidence of the decision-making process that yielded the final decision, and it may be that questionable aspects of or inconsistencies among those pre-final decisions will prove significant in determining whether a plan administrator abused its discretion. *See, e.g., Miller*, 632 F.3d at 855-56 (considering unexplained inconsistencies between a plan administrator's initial and final disability determinations as a factor suggesting an abuse of discretion). In those instances, however, the pre-final decisions ought merely to inform a court's review of the final decision. *See generally id.*

> If the terms are unambiguous, then any actions
> taken by the plan administrator inconsistent
> with the terms of the document are arbitrary.
> But actions reasonably consistent with
> unambiguous plan language are not arbitrary. If
> the reviewing court determines the terms of a
> plan document are ambiguous, it must take the
> additional step and analyze whether the plan
> administrator's interpretation of the document is
> reasonable.

*Bill Gray Enters., Inc. Emp. Health & Welfare Plan v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001); *see also McElroy v. SmithKline Beecham Health & Welfare Benefits Trust Plan for U.S. Emps.*, 340 F.3d 139, 143 (3d Cir. 2003) (holding that plan administrator was authorized to interpret plan language that was "equivocal").

Regardless of CIGNA's characterization of what it did here, it does not appear that it interpreted ambiguous Plan terms. Indeed, the Plan's requirements for determining phase two disability appear to be clear and thus unsuited to any further interpretation. The issue, then, is whether CIGNA acted "reasonably consistent with" those requirements. *Gourley*, 248 F.3d at 218. In our view, it did. The Plan required CIGNA to determine whether Funk was capable of working in any job that would pay him 60% of his former pay. CIGNA literally complied with that requirement when it determined that Funk could, without restrictions, "perform[] his regular occupation" (*id.* at 186), i.e., his former job at Lucent. It went without saying that his former job could be understood to pay 100% of his former wage. Moreover, because CIGNA's determination that Funk was not disabled

21

did not turn on the existence of an alternative 60% job, it was unnecessary to discuss in its decision any alternative 60% jobs. CIGNA's decision was therefore reasonably consistent with the Plan, and the District Court's contrary holding was in error.[12]

## 2. Whether Substantial Evidence Supported CIGNA's Decision

In the alternative, the District Court concluded that CIGNA's decision was not supported by substantial evidence because it did not give proper consideration to the evidence and was infected by a conflict of interest. Regarding the latter point, the Court stated that CIGNA "exhibited a financial conflict of interest in the way that the plan for Lucent was administered." (App. 1 at 11.) The Court reasoned that because CIGNA was a claim administrator operating in a competitive market, it labored under a conflict. Citing *Glenn*, the District Court said, "if a company is a claim administrator that offers itself to self-funded plans in a competitive market, then its incentive is to keep claims down to be more attractive to potential plans," which incentivizes the claim administrator to "over-deny claims." (*Id.* at 11-12 n.12.)

That analysis, however, does not take full account of the Supreme Court's instructions in *Glenn*. A party's status

---

[12] Even if we were to consider CIGNA as having engaged in Plan interpretation, rather than straightforward Plan execution, the same rationale supports the conclusion that CIGNA's interpretation was reasonable.

22

as a third-party plan administrator does not automatically encumber it with a material conflict of interest. While the Supreme Court in *Glenn* did say that, "for ERISA purposes a conflict exists" when a third-party plan administrator operates in a competitive market for the delivery of such services,[13] the Court also acknowledged that the conflict may be of little or no practical significance. *See* 554 U.S. at 114-15 (explaining that, while a plan administrator may have a conflict of interest by virtue of its participation in a competitive market, a court "can nonetheless take account of the circumstances … which … diminish[] the *significance* or *severity* of the conflict in individual cases" (emphasis original)).

Here, as even Funk rightly and frankly acknowledged at oral argument, there is nothing to suggest that CIGNA was laboring under a meaningful conflict of interest. Thus, the District Court should not have given the significant weight it appeared to give to a largely hypothetical conflict. Because we cannot be sure of the extent to which the District Court's weighing of that factor affected the Court's holding, we will remand the case for a reevaluation of CIGNA's claim

---

[13] "For one thing," the *Glenn* Court said, "the employer's own conflict may extend to its selection of an insurance company to administer its plan. An employer choosing an administrator in effect buys insurance for others and consequently (when compared to the marketplace customer who buys for himself) may be more interested in an insurance company with low rates than in one with accurate claims processing." *Glenn*, 554 U.S. at 114.

decision in light of the other factors cited by the District Court.

### B.  Recouping Overpayment

We now turn our attention to CIGNA's counterclaim seeking recoupment of overpaid LTD benefits.  Under ERISA, a fiduciary may bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).  However, a fiduciary may only seek relief under § 1132(a)(3) if the relief sought falls within "those categories of relief that were *typically* available in equity," *Sereboff v. Mid Atlantic Med. Servs., Inc.*, 547 U.S. 356, 361 (2006) (internal quotation marks omitted) (emphasis original), and "the basis for its claims is equitable," *id.* at 363.  CIGNA here seeks equitable relief to enforce provisions of the Plan and the related Reimbursement Agreements.

In *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), an insurer that had paid medical bills for an insured who had been injured in a car accident sought, pursuant to a plan provision that reserved "a first lien upon any recovery … that the beneficiary receives from [a] third party," *id.* at 207 (internal quotation marks omitted), reimbursement from the insured after she recovered in tort for her injuries, *id.* at 207-09.  The Supreme Court rejected the insurer's claim, explaining that the relief sought could not be categorized as equitable unless the insured possessed the particular property to which the lien would attach at the time

24

relief was sought. Because the settlement funds over which the insurer sought to impose a lien were in a trust, not in the insured's possession, the insurer's claim failed. *Id.* at 213-14. In those circumstances, the Court explained, the insurer was effectively seeking recovery from the insured's general assets, which made the relief sought legal, not equitable, and thus impermissible under § 1132(a)(3). *Id.* at 214.

Subsequently, in *Sereboff*, the Supreme Court held an insurer's claim for reimbursement was permissible under § 1132(a)(3), despite quite similar facts. As in *Knudson*, the insurer in *Sereboff* sought to recoup medical expenses from an insured who had received a tort settlement. *Sereboff*, 547 U.S. at 359. The insurer relied on a plan provision requiring the insured to "'reimburse [the insurer]' for [medical] benefits from '[a]ll recoveries from a third party (whether by lawsuit, settlement, or otherwise)." *Id.* In *Sereboff*, though, the funds upon which the insurer sought to impose a lien were in the insured's investment accounts, and so were still in the insured's possession. *Id.* at 362-63. The Court identified that fact as a meaningful basis for distinguishing *Knudson*, explaining that the "impediment to characterizing the relief in *Knudson* as equitable [was] not present," *id.* at 362, because the insurer in *Sereboff* was seeking "to recover a particular fund from the [insured]," *id.* at 363.

The Court in *Sereboff* described the insurer's claim as reflecting an equitable lien "by agreement" – that is, a lien arising out of an agreement to convey ownership of specific property to one party as soon as the counterparty gets title to the property. *Id.* at 363-65 (citing *Barnes v. Alexander*, 232 U.S. 117, 121 (1914)). The insurance plan provision requiring reimbursement gave rise to such a lien. *Id.* When

25

there is an equitable lien by agreement, the Court said, the lien "follow[s]" the contracted-for property "into the [counterparty's] hands," i.e., it attaches to the specified property "as soon as [the property] [is] identified." *Id.* at 364. Consistent with that operation, the Court observed, "the fund over which [an equitable] lien [by agreement] is asserted need not be in existence when the contract containing the lien provision is executed." *Id.* at 366. Moreover, the Court said, there is no "tracing requirement" for an equitable lien by agreement. *Id.* at 365. Property to which the lien attached may be converted into other property without affecting the efficacy of the lien. *See id.* (observing that the property at issue in *Barnes* had been converted into other property without disturbing the equitable lien by agreement).[14]

In the present case, Funk argues that, because the funds upon which CIGNA sought to impose the lien – the Social Security award – were no longer in his possession, the District Court correctly followed *Knudson* and rejected

---

[14] The Supreme Court's description of equitable liens by agreement in *Sereboff* as laying claim to property not yet in possession and remaining valid even if the later acquired-property is converted strongly implies that, in that context and contrary to the Court's discussion in *Knudson*, the defendant need not possess the property at the time relief is sought in order for the relief to be equitable – any post-agreement possession will suffice. *See generally Sereboff*, 547 U.S. at 361-366 (recognizing that equitable liens by agreement operate where property is not yet in defendant's possession and where property was in defendant's possession and then converted).

26

CIGNA's claim for an equitable lien. If, however, there was an equitable lien by agreement that attached to the Social Security award as soon as Funk received it, dissipation of the funds was immaterial. CIGNA asserts that it has an equitable lien by agreement, citing the Plan and the Reimbursement Agreements as agreements identifying specific funds (the Social Security award) and a particular share of those funds (the amount of overpayment) to which its lien attached.

Considering the Plan and the Reimbursement Agreements, we believe that CIGNA has the better of those arguments. The Plan provides that a Social Security offset "shall be … payable … by the recipient." (App. 2 at 172.) Likewise, the Reimbursement Agreements provide, respectively, for "reimburse[ment] … for any LTD overpayment" (*id.* at 566 (June 22, 2005 agreement)) and "reimburse[ment of] the full amount of any overpayment" (*id.* at 531 (August 13, 2005 agreement)). The Supreme Court in *Sereboff* held that language specifying a right to reimbursement from "[a]ll recoveries from a third party (whether by lawsuit, settlement, or otherwise)" was sufficient to create an equitable lien by agreement. 547 U.S. at 359, 369 (internal quotation marks omitted). Because the Plan and Reimbursement Agreements at issue here likewise specify the receipt of Social Security benefits as the particular fund from which reimbursement is to be made, they give rise to an equitable lien by agreement over those Social Security funds that are overpayments under the Plan.[15] Thus, the relief

_____

[15] We acknowledge that the Plan and the Reimbursement Agreements, beyond providing that receipt of a Social Security award triggers the obligation to reimburse the amount of any overpayment, could have been clearer in

27

CIGNA seeks is appropriate under § 1132(a)(3), and Funk must reimburse the $6,317 yet due and owing to CIGNA from the overpayment.

## IV.    Conclusion

For the foregoing reasons, we will vacate the District Court's order with respect to CIGNA's denial of benefits, reverse the District Court's order with respect to CIGNA's counterclaim, and remand the case to the District Court for further proceedings consistent with this opinion.

---

specifying that reimbursement must come out of or from the Social Security award. However, in light of the language found sufficient in *Sereboff*, we have little trouble concluding that the language here was sufficiently specific regarding Social Security awards to create an equitable lien by agreement.