NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 10-4367

_____

BOARD OF TRUSTEES OF PLUMBERS & PIPEFITTERS LOCAL
UNION NO. 9 WELFARE FUND,

v.

RICHARD DREW,
                              Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 09-cv-05069)
District Judge:  Hon. Garrett E. Brown, Jr.

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 15, 2011

Before:  RENDELL, JORDAN and BARRY, *Circuit Judges*.

(Filed: September 16, 2011 )
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Richard Drew appeals the October 22, 2010 order of the United States District Court for the District of New Jersey granting summary judgment for the Board of Trustees of Plumbers & Pipefitters Local Union No. 9 Welfare Fund (the "Board"), the sponsor and fiduciary of the Plumbers & Pipefitters Local Union No. 9 Welfare Fund (the "Fund"), on its equitable claim for reimbursement pursuant to § 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1132(a)(3) ("§ 502(a)(3)"). The reimbursement claim[1] arose from medical expenses that the Fund paid for Drew's treatment for injuries he suffered in a traffic accident. For the reasons that follow, we will vacate the grant of summary judgment and remand the case for further consideration consistent with this opinion.

## I. Background[2]

### A. The ERISA Plan

At all times relevant to this appeal, Drew was a participant in the Fund,[3] which is a Federal, tax-exempt, "multiemployer plan," as defined in 29 U.S.C. § 1002(37)(A), and a

---

[1] Though the initial claim for equitable reimbursement was made by the plan administrator of the Fund on behalf of the Board, it is now being advanced by the Board. As do the parties, we will refer to the claim as being made by and in the name of the Fund.

[2] Because we are reviewing a grant of summary judgment, we recount the facts in the light most favorable to the non-movant, Drew.

[3] To be a participant is to be "any employee or former employee of an employer … who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer…." 29 U.S.C. § 1002(7).

2

self-funded, "employee welfare benefit plan," as defined in 29 U.S.C. § 1002(1). The terms and conditions governing the Fund are described in a booklet known as the Plan and Summary Plan Description (the "SPD"). Generally, the SPD provides Fund participants with information pertaining to the Fund benefits, as well as certain rules and regulations that apply to the Fund. Among other things, the SPD provides that the Fund has a right to reimbursement and subrogation against a Fund participant when the participant receives money from a third party to compensate for personal injury or illness for which the Fund has already paid some compensation to the participant. The pertinent clause in the SPD (the "Reimbursement Clause") states that:

> If the Fund pays benefits to or on behalf of a Participant … arising out of any event for which the Participant files, or has the right to file, a claim for medical benefits payable under any Workers' Compensation or similar statute or a legal action to recover damages for personal injury or illness, the Participant shall notify the Fund of such claim or action and the Fund shall be entitled to reimbursement from any payment made as a result of such claim or action to the full extent of the benefits paid out by the Fund.

> At the time of filing a claim for benefits under the Plan, the Participant … shall execute a Repayment Agreement which fully implements the intent of [the paragraph] above.

(App. at 42.)

### B. The Accident and Settled Claims

On September 18, 2001, Drew sustained various injuries in an automobile accident. Between September 21, 2001, and January 21, 2009, the Fund paid $181,579.61 to Drew for medical expenses related to those injuries. Since the at-fault driver in the accident carried minimal insurance coverage, Drew only received $10,000 from that driver's liability policy. Consequently, Drew filed a claim for uninsured

3

motorist ("UIM") benefits.[4]  He later settled his UIM claim for $900,000.[5]  From the UIM settlement proceeds, Drew's attorney deposited the total of the amounts that the Fund had previously paid to Drew, the $181,579.61, into a trust account, where it remains.

### C.      The Repayment Agreements and Addendum

Prior to the UIM settlement, the Fund asked Drew to execute a form Repayment Agreement (the "Agreement") in connection with the medical expenses paid to Drew by the Fund.  The Agreement, which is referenced in the Reimbursement Clause, provides that the Fund participant:

> Agree[s] that with respect to any payments received by [the participant] or on [the participant's] behalf of any kind, which shall include payment for "pain and suffering" by way of either judgement [sic] or settlement arising out of said claim, [the participant] shall repay the Fund for all payments made to [the participant] or on [the participant's] behalf, arising out of or relating to the aforesaid claim.

---

[4] Drew notified both his employer's insurer and his own auto insurer that he would pursue claims for UIM benefits under their respective policies.  Each insurer denied primary liability on the claim and litigated the issue by way of a declaratory judgment action, which was ultimately settled by the parties and dismissed on May 24, 2004.

[5] The claims director who settled Drew's UIM claim wrote a letter dated February 19, 2009, regarding the basis of the settlement amount.  That letter reads:
> The claim for reimbursement was brought to my attention and taken into consideration as a part of the overall assement [sic] of Mr. Drews [sic] total injury and disability.  The overall settlement was based upon the years of pain and suffering Mr. Drew has and will in the future continue to endure as well as the vast physical limitations he has and will continue to have on a permanent basis.

(App at 570.)

4

(App. at 43.)  Rather than sign the Agreement, however, Drew, through his counsel, modified it to state that his repayment obligation was limited to payments he received by judgment or settlement for medical bills.  As modified, the Agreement provided that the Fund participant:

> Agree[s] that with respect to any payments received by [the participant] for medical bills which shall include UIM claims made by way of either judgement [sic] or settlement arising out of said claim, [the participant] shall repay the Fund for all payments made to [the participant] or on [the participant's] behalf, arising out of or relating to the aforesaid claim.

(App. at 46.)  Thus, the modified Agreement replaced the phrase "or on [the participant's] behalf of any kind, which shall include payment for 'pain and suffering'" with "for medical bills which shall include UIM claims made."  (App. at 43.)  The modified Agreement bore the typewritten date of July 15, 2002.  When Drew signed the modified Agreement, he dated it July 18, 2002.  The record does not reflect that the modifications to the Agreement were ever adopted or otherwise acknowledged by the Fund, although Drew claims in his briefing before us, as well as in the Rule 56.1 Statement of Material Facts Not in Dispute that he submitted to the District Court, that they were negotiated with the Fund.  (App. at 518 ¶ 14.)  The Fund contends on appeal, as well as in its Rule 56.1 Statement of Material Facts Not in Dispute, that it would not accept the modified Agreement.  (App. at 102 ¶ 21.)

The Fund also required Drew and his attorney to sign a document titled Addendum to Repayment Agreement (the "Addendum"), which he did on July 18, 2002. The portion he signed reads:

5

I, RICHARD DREW, participant, hereby agree to have a lien placed on my file for all actions taken as a result of my September 18, 2001, accident and I acknowledge my responsibility to give full force and effect to the Subrogation Rights as per the attached pertinent section of the Fund's Rules and Regulations.

(App. at 48.)

A few days later, on July 22, 2002, Drew's attorney signed the Addendum. The portion of the Addendum signed by Drew's attorney reads:

I … am the legal representative for the participant and do hereby acknowledge that I have placed a lien on Mr. Drew's file and acknowledge that we shall have an affirmative duty to assert the Fund's medical lien and we shall be required to show proof to the Fund that said medical lien was fully protected.

(App. at 48.)

To date, Drew has not reimbursed the Fund for what it paid for his medical expenses.

### D. Proceedings in the District Court

Ultimately, the Board filed suit to recover that $181,579.61. The Board and Drew filed cross motions for summary judgment,[6] and the District Court granted summary judgment to the Fund. The Court held that it had subject matter jurisdiction under *Sereboff v. Mid Atlantic Medical Services*, 547 U.S. 356 (2006), that the Fund's claim was equitable and enforceable under *Sereboff*, that certain aspects of New Jersey's auto insurance and collateral source statutes were preempted by ERISA, and that the provisions of the SPD, of the Agreement, and of the Addendum were unambiguous and supported the Fund's reimbursement claim. Regarding the modifications to the

---

[6] Drew filed a motion to dismiss, or in the alternative, for summary judgment.

6

Agreement, the District Court held that they were nullified by Drew's execution of the Addendum. The District Court rejected Drew's argument that the SPD did not establish a right to reimbursement. Based on the Court's conclusion that the relevant Fund language was unambiguous, it also rejected Drew's argument that the "make whole" rule[7] should apply and prevent the Fund from receiving any recovery.

Drew timely appealed.

## II.     Discussion[8]

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002). Applying that standard, we exercise plenary review of the District Court's grant of summary judgment. *Id.*

On appeal, Drew contends that the District Court erred in (i) determining that the Fund had a claim for "appropriate equitable relief" under ERISA against the settlement funds held in the escrow account; (ii) determining that certain aspects of New Jersey's auto insurance and collateral source statute were preempted by ERISA; and (iii) failing to give effect to the modifications made to the Agreement in resolving whether an ambiguity existed among the operative documents governing reimbursement. While we

---

[7] The "make whole" rule is an equitable principle which provides that "a plan participant has no duty to reimburse a plan until that person has been 'made whole,' i.e. been fully compensated for all injuries sustained." *Bill Gray Enters. v. Gourley*, 248 F.3d 206, 220 n.13 (3d Cir. 2001).

[8] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1). We have jurisdiction pursuant to 28 U.S.C. § 1291.

disagree with Drew on the first two contentions, we agree that there is a genuine issue of material fact as to the last contention.

### A. Right to Reimbursement Under ERISA

Drew argues that the District Court erred in its analysis of the factors necessary to support a claim for "appropriate equitable relief" under ERISA. Under § 502(a)(3), a fiduciary may bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). However, a fiduciary may only seek relief under § 502(a)(3) if the relief sought falls within "those categories of relief that were *typically* available in equity," *Sereboff*, 547 U.S. at 361 (internal quotation marks omitted) (emphasis original), and "the basis for its claim is equitable." *Id.* at 363. When a plan governed by ERISA seeks "to impose a constructive trust or equitable lien on 'particular funds or property in the defendant's possession,'" *id.* at 362 (citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002)), it seeks relief of a type based in equity and that has typically been available in equity. *Id.* at 363-64.

The District Court correctly determined that the Fund is seeking equitable relief in the form of a constructive trust or equitable lien on the settlement funds held in the escrow account maintained by Drew's attorney. Thus, the Fund is seeking "its recovery through a constructive trust or equitable lien on a specifically identified fund, not from the [participant's] assets generally…." *Sereboff*, 547 U.S. at 363. Because the Fund

8

seeks such equitable relief, and not personal liability against Drew, the relief qualifies as restitution under § 502(a)(3). *Cf. Funk v. CIGNA Grp. Ins.*, No. 10-3936, 2011 WL 3332669 (3d Cir. Aug. 4, 2011) (holding that plan was entitled to equitable relief under § 502(a)(3) to recover a plan participant's Social Security benefits that were deemed overpayments under the plan's reimbursement provisions and two reimbursement agreements executed by the plan participant).

### B. Preemption

Drew also contends that the District Court erred when it held that New Jersey's auto insurance statute, N.J. STAT. ANN. § 39:6A-1 *et seq.*, and collateral source statute, N.J. STAT. ANN. § 2A:15-97, are in certain circumstances preempted by ERISA. Drew argues that those state statutes limit his recovery in his own personal injury claim by precluding tort liability for medical expense claims and expressly prohibiting his recovery for any loss otherwise compensated by way of a collateral source of benefits. As Drew sees it, the Fund has already paid for his medical expenses and, therefore, no portion of his settlement can – under state law – be characterized as compensation for medical expenses. He goes on to conclude that the Fund cannot satisfy its equitable claim for reimbursement of medical expenses by seeking money from settlement funds that, by state law definition, are meant to make him whole for losses besides medical expense.

We agree with the District Court that those contentions cannot withstand close scrutiny. ERISA contains an express preemption clause, 29 U.S.C. § 1144(a), which we interpret broadly. *Gourley*, 248 F.3d at 212. That clause provides that, "[e]xcept as

9

provided in … [ERISA's savings clause], the provisions of this subchapter [] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan… ." 29 U.S.C. § 1144(a). The "savings clause" referenced in that preemption clause is found at 29 U.S.C. § 1144(b)(2)(A) and says that, in general, a state law will not be preempted if it "regulates insurance."[9] In yet another ERISA clause, however, one known as the "deemer clause," there is an important caveat to the savings clause. It says, in essence, that states cannot regulate self-funded ERISA plans under the guise of regulating insurance.[10]

In short, ERISA's deemer clause "exempt[s] certain employee benefit plans from the reach of state laws otherwise saved from preemption under the savings clause." *Levine*, 402 F.3d at 164 n.11. The Supreme Court has "read the deemer clause to exempt self-funded ERISA plans from state laws that 'regulate insurance' within the meaning of the savings clause." *Gourley*, 248 F.3d at 213 (quoting *FMC Corp. v. Holliday*, 498 U.S. 52, 61 (1990)). The Fund is a self-funded ERISA plan, and it is, accordingly, beyond the reach of the state laws Drew cites. More specifically, New Jersey's collateral source statute is preempted by ERISA's explicit preemption clause because it "relates to" an

---

[9] "[F]or a 'state law to be deemed a law … which regulates insurance,'" it must (1) "be 'specifically directed towards entities engaged in insurance'" and (2) "'substantially affect the risk pooling arrangement between the insurer and the insured.'" *Levine v. United Healthcare Corp.*, 402 F.3d 156, 164 n.11 (3d Cir. 2005) (citing *Kentucky Ass'n. of Health Plans Inc. v. Miller*, 538 U.S. 329, 341-42 (2003)).

[10] The deemer clause states that "[n]either an employee benefit plan ... nor any trust established under such a plan, shall be deemed to be an insurance company or … to be engaged in the business of insurance … for purposes of any law of any State purporting to regulate insurance companies…." 29 U.S.C. § 1144(b)(2)(B).

10

ERISA plan and does not even purport to "regulate insurance" within the meaning of the savings clause. *Levine*, 402 F.3d at 166. As for New Jersey's automobile insurance statute, even assuming that it "regulate[s] insurance" in a way that would bring it within ERISA's savings clause, it is nevertheless of no effect in determining the meaning of the Fund's governing documents because, under the deemer clause, self-funded ERISA plans like the Fund are exempt from any state insurance regulation to the extent there is a conflict with ERISA. The District Court correctly understood that there would be such a conflict if New Jersey laws were applied as Drew urges, with state law dictating the recoverability of monies paid under an ERISA plan.

C.    *Reimbursement and Subrogation Language*

After establishing that the Fund may seek restitution under § 502(a)(3), and that the New Jersey auto insurance and collateral source statutes do not limit the Fund's ability to seek restitution, we now turn to the question of whether summary judgment in favor of the Fund was proper. The answer depends upon whether there is ambiguity in the plan documents, specifically, ambiguity in the SPD, the modified Agreement, and the Addendum. [11]

The standard under which a court reviews a plan administrator's interpretation of plan language has been described in various ways. Recently, the Supreme Court reviewed such actions under an abuse of discretion standard. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008). Prior to *Glenn*, we reviewed such actions under an

---

[11] The parties and the District Court assume, without discussion, that those three documents are part of the plan governing the Fund. We accept that assumption for purposes of our analysis.

arbitrary and capricious standard. *See Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 526 n.2 (3d Cir. 2009). Since *Glenn*, in the ERISA context, we have treated the abuse of discretion standard and the arbitrary and capricious standard as functionally the same. *See Estate of Schwing*, 562 F.3d at 526 n.2 (noting that those two standards of review are "practically identical" in the ERISA context). Actions that are "reasonably consistent with unambiguous plan language are not arbitrary." *Funk*, 2011 WL 3332669, at *8 (quoting *Gourley*, 248 F.3d at 218).

The District Court held that the reimbursement and subrogation statements in the SPD, and in the form Agreement, and in the Addendum are all "essentially identical," (App. at 15) and that, taken together, they are unambiguous. Furthermore, in granting summary judgment in favor of the Fund, the District Court reasoned that, "[r]egardless of whether [the Fund] agreed to th[e] modified language [in the Agreement] or not, this language was nullified by [Drew's] signing of the Addendum, which … state[d] that he 'acknowledge[d his] responsibility to give full force and effect to the Subrogation Rights as per the attached pertinent section of the Fund's Rules and Regulations.'" (App. at 15-16.)

Despite the District Court's explicit referencing of the modifications to the form Agreement, Drew contends that the Court simply discarded those modifications in analyzing whether the reimbursement language unambiguously supported the Fund's claim for reimbursement. He argues that if the District Court had properly considered the Agreement as modified, it would have found an ambiguity between the relevant reimbursement provisions. The Fund responds that no ambiguity exists because it

12

affirmatively rejected the modifications to the Agreement, and because the Addendum signed by Drew repeated and reinforced the Fund's right to reimbursement as provided in the SPD.

While we cannot agree, as Drew implies, that the District Court ignored the modified Agreement, we do agree that it did not adequately address whether the modifications to the Agreement introduced an ambiguity into the question of Drew's repayment obligation. In particular, the District Court bypassed a significant factual dispute by failing to address whether the Fund manifested its assent to the modified Agreement and whether the modified Agreement was negotiated by the parties in connection with the signing of the Addendum. If, as events unfolded, the Fund effectively rejected Drew's effort to modify the form Agreement, then the Fund and the District Court are correct that the plan unambiguously gives the Fund the right to recoup the medical expenses it paid for Drew's treatment. But if, as Drew contends, the modifications to the Agreement were part of a negotiated deal on the respective rights of the parties, then the modifications were not overridden by the Addendum and there may be an ambiguity.[12]

---

[12] Moreover, we note that the Subrogation provision, the first paragraph of which the District Court quotes in concluding that the repayment obligation is not limited to medical bills (App. at 10), contains a second paragraph that states: "At the time of filing a claim for benefits under the Plan, the Participant shall execute a Repayment Agreement which fully implements the intent of (1) above." The third paragraph also notes the importance of the execution of a Repayment Agreement. We leave it to the District Court in the first instance to decide whether these provisions further the ambiguity, or, perhaps, makes it unambiguous that the Repayment Agreement controls. (We also note, with some concern, that this important document was not included in the Appendix filed on appeal.)

13

If plan language is ambiguous, a plan administrator is authorized to interpret it, *McElroy v. SmithKline Beecham Health & Welfare Benefits Trust Plan for U.S. Emps.* 340 F.3d 139, 143 (3d Cir. 2003) (holding that plan administrator was authorized to interpret plan language that was "equivocal"), so long as "the plan administrator's interpretation of the document is reasonable." *Funk*, 2011 WL 3332669, at *8 (quoting *Gourley*, 248 F.3d at 218). On remand, the District Court will need to determine how to resolve the factual dispute over the adoption or rejection of the modifications to the Agreement, and, further, whether the modified Agreement, if assented to by the Fund, introduced an ambiguity into the relevant documents. If an ambiguity exists, the District Court should analyze whether the Fund's interpretation of the relevant documents was reasonable, that is, whether it fell within the discretion of the plan administrator. [13]

---

[13] Additionally, if an ambiguity does exist, the District Court may also consider whether the "make whole" doctrine should apply. Drew contends that the District Court erred by not applying the "make whole" doctrine. This Circuit has been hesitant to adopt that federal common law doctrine. In rejecting the application of the "make whole" doctrine, the *Gourley* Court stated that "importing federal common law doctrines to ERISA plan interpretation is generally inappropriate, particularly when the terms of an ERISA plan are clear and unambiguous." *Gourley*, 248 F.3d at 220 n.13 (*citing Bollman Hat Co. v. Root*, 112 F.3d 113, 117 n.3 (3d Cir. 1997) (citing authorities)). Since the plan provision providing for reimbursement in *Gourley* was unambiguous, the Court declined to apply the "make whole" doctrine.

At this point, we need not reach the issue of whether the "make whole" doctrine should apply here. On remand, if the District Court finds that the Fund affirmatively rejected the modified Agreement, and that no ambiguity exists, then the "make whole" doctrine should not apply. If, however, the District Court finds that the Fund manifested its assent to the modified Agreement, and that an ambiguity exists between the modified Agreement as compared to the SPD and the Addendum, then the District Court may consider the applicability of the "make whole" doctrine.

**III.    Conclusion**

For the foregoing reasons, we will vacate the District Court's grant of summary judgment for the Fund and remand the case to the District Court for further consideration consistent with this opinion.